**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF MISSISSIPPI**

– – – – – – – – – – – – – – – – – – – – – – – – – – – X
– – – –

Robert Harris, Darius Harris, Eric Redmond, Malcolm
Stewart, and Peter Reeves

                              *Plaintiffs*,

                     against

Sam Dobbins, in his individual capacity, Charles
Henderson, in his individual and official capacities as
Interim Chief of Police of Lexington, Mississippi, the
City of Lexington, the Lexington Police Department,

                         *Defendants*.

:
:
:
:
:
:
:
:

Docket No.: 3:22-cv-479-TSL-MTP
                 ————————

– – – – – – – – – – – – – – – – – – – – – – – – – – – X
– – – –

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR**
**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## FACTUAL BACKGROUND

***Lexington's History of Discrimination and Disparate Treatment***

      Defendants have committed acts of explicit racial animus against the backdrop of an

extensive history of racism in Lexington, Mississippi. For example, the White officials of

Lexington and Holmes County historically denied Black residents right to vote. It was not until

the federal government intervened with the Voting Rights Act of 1965 (VRA) that Black

individuals in Holmes County were able to register. The year before the VRA was passed,

Holmes County had only twenty registered Black voters.[1] But two years after the passage of the VRA, in 1967, there were over 6,000 Black voters registered in the County.[2] Despite the passage of the VRA, the Black vote remained diluted, as local officials vigorously resisted registering Black individuals to vote. This voter dilution persists to this day and, in the wake of *Shelby County v. Holder* (2013), has worsened.[3]

Local law enforcement violently retaliated against Black individuals who attempted to register to vote in Lexington prior to the passage of the VRA, just as LPD continues to retaliate against Black Lexington citizens for exercising their First Amendment rights today. For instance, a group of 14 Black residents were violently confronted by the Holmes County Sheriff, thirty auxiliary police officers, and other White public officials when they attempted to register to vote in April 1963.[4] The home of one of these individuals, Hartman Turnbow, was firebombed and shot at in retaliation for attempting to register to vote.[5] Mr. Turnbow called the Holmes County Sherriff's office seeking aid, but the sheriffs arrived several hours later.[6] They arrested *Mr. Turnbow* for arson and then arrested Robert Moses, who was also Black, for "interfering with the investigation" simply because Moses was taking pictures.[7] This is just one of many instances of

---

[1] David C. Colby, *The Voting Rights Act and Black Registration in Mississippi*, 16 PUBLIUS 123, 123 (1986).
[2] *Id.*
[3] *See* Kevin Morris, Peter Miller, and Coryn Grange, *Racial Turnout Gap Grew in Jurisdictions Previously Covered by the Voting Rights Act*, Brennan Center for Justice (Aug. 20, 2021), https://www.brennancenter.org/our-work/research-reports/racial-turnout-gap-grew-jurisdictions-previously-covered-voting-rights (noting the growing racial turnout gap throughout the state of Mississippi).
[4] Holmes County Civil Rights Movement, Mississippi Encyclopedia, last accessed Aug. 12, 2022. https://mississippiencyclopedia.org/entries/holmes-county-civil-rights-movement/.
[5] Hartman Turnbow, SNCC Digital Gateway, last accessed Aug. 12, 2022. https://snccdigital.org/people/hartman-turnbow/.
[6] *United States v. Holmes County*, 385 F.2d 145, 147 (5th Cir. 1967).
[7] *Id.*

local law enforcement officers targeting and harassing Black Lexington citizens in retaliation for their First Amendment activity.

Lexington also has a history of racially segregated public facilities, including public schools. White officials of Holmes County were so resistant to integrating public schools that the United States Supreme Court needed to intervene in 1969, ordering the Holmes County Board of Education to integrate its schools. *Alexander v. Holmes County Bd. of Ed.*, 396 U.S. 19 (1969). Although the Supreme Court invalidated Holmes County's *de jure* segregation in 1969, *de facto* racial segregation persists in Holmes County schools today. Holmes County is about 16% White and 82% Black, but the public schools are nearly 100% Black. There are fewer than 30 White students enrolled in Holmes County's public schools, as most White families in the County send their children to private schools to avoid integration.[8]

***Defendant Dobbins***

The explicit racial animus exhibited by White public officials and employees in Lexington persists today. The audio of Defendant Dobbins, then-Chief of LPD, released in late July 2022 making racist and homophobic remarks and bragging about killing citizens supports the claim that the City of Lexington has a history of discrimination against and disparate treatment of its Black citizens and that LPD's constitutional violations and misconduct have a discriminatory intent. On or about July 18, 2022, JULIAN, a civil and international rights organization, obtained and released the audio of Defendant Dobbins, saying "nig***" and "fa**ot," and telling an LPD officer that he would not care if the officer "killed a motherf**ker in cold blood." In the nearly 17-minute recording, Defendant Dobbins continues, telling the

---

[8] Bracey Harris, *Crumbling Schools, Dismal Outcomes: Alexander v. Holmes County Board of Education was supposed to change everything for Southern black children*, The Hechinger Report (Feb. 9, 2020), https://www.clarionledger.com/in-depth/news/politics/2020/02/10/black-children-holmes-county-mississippi-denied-equal-education/4510336002/.

officer that he has killed 13 people in his career and "justified" even shooting one man who was running away from him 119 times. Unaware that the conversation was being recorded, Defendant Dobbins relished in the fact that the Lexington community "fears" him. Even though there was national pressure to take action after the audio was released, Lexington's Board of Aldermen only narrowly voted 3-2[9] to terminate Defendant Dobbins and did so begrudgingly.

After terminating Defendant Dobbins, the Lexington Board of Aldermen appointed Defendant Henderson as Interim Chief. However, the replacement does not constitute a change in leadership because throughout Defendant Henderson's tenure with LPD as the chief's second in command, he helped Defendant Dobbins carry out the department's targeting, harassment, and abuse of Black Lexington citizens. Further, based on information and belief, Defendant Dobbins was terminated in title only, and continues to menace Black Lexington citizens, patrolling in the passenger seat of a police-issued vehicle with an on-duty officer. Even the Mayor of Lexington is reportedly afraid of what Defendant Dobbins may do.

Not only did Defendant Dobbins hold these racist and homophobic beliefs and relish in killing citizens while on duty, but he encouraged LPD officers to carry out their duties based on these beliefs, resulting in excessive, unnecessary, and unreasonable force being used against Black Lexington citizens; illegal searches and seizures, false arrests, and arrests for minor traffic violations being perpetrated against Black Lexington citizens; retaliatory actions against Black Lexington citizens for speaking out against LPD's constitutional violations and misconduct; and a lack of proper training, supervision, and certification of LPD officers.

***Lexington Police Department***

---

[9] It is worth noting that following the Lexington Board of Aldermen's vote, one of the Black aldermen who voted to terminate Defendant Dobbins was fired from his job at a white-owned funeral home and threatened by white citizens who told him, "N***er, we told you how to vote." Out of fear for his life, that alderman has ceased communication with civil rights groups.

LPD maintains an ongoing pattern, practice, and custom of using disproportionate and unnecessary force against Black Lexington citizens, making illegal searches, seizures, and false arrests, and retaliating against anyone who reports misconduct—including their own officers.

***Excessive, Unnecessary, and Unreasonable Force***

Under the leadership and direction of first Defendant Dobbins, and now Defendant Henderson, and pursuant to LPD's policies, practices, and customs, LPD has engaged in excessive, unnecessary, and unreasonable force against Black Lexington citizens who were not resisting arrest or posing any threat of harm to officers, themselves, or others. In addition to the excessive force used on Plaintiffs, as described in detail below, LPD officers have used excessive force on other Black Lexington citizens. On multiple occasions, LPD officers have physically assaulted individuals being held in their custody, including a beating so severe that the officers left a man on the curb outside of the hospital after the assault. In one instance, after breaking down her door without a warrant and arresting her without reading her Miranda rights, LPD officers, with Defendant Henderson present, maced and later hosed down an elderly woman in her sixties and left her outside in the middle of winter with nothing on but her nightgown.

Not only do the LPD officers committing constitutional violations and misconduct go uninvestigated and undisciplined, but the senior law enforcement officers at LPD condone, endorse, and in some cases, participate in, this behavior. Defendant Henderson, in his individual capacity, has used excessive, unnecessary, and unreasonable force. In one instance, Defendant Henderson shoved an elderly woman against her car during an unnecessary stop even though she compliant, did not resist orders, and did not attempt to flee. Despite dozens of instances of excessive force used against Black Lexington citizens, LPD refuses to take any action to provide additional training or supervision or investigate or discipline its officers.

*Illegal Searches and Seizures, False Arrests, and Arrests for Minor Traffic Violations*

Under the leadership and direction of first Defendant Dobbins, and now Defendant Henderson, and pursuant to LPD's policies, practices, and customs, LPD has perpetrated illegal searches and seizures and made false arrests without probable cause. LPD has a policy of stopping and searching hundreds of drivers every year through the use of roadblocks that serve no other purpose than harassing and terrorizing Black Lexington citizens. On information and belief, LPD conducted roadblocks multiple times per day for several months in Lexington. Multiple accounts confirm that LPD sets roadblocks near the predominantly-Black Holmes County Central High School anytime the school held events. By contrast, LPD does not conduct roadblocks during activities of the predominantly-White Central Holmes Christian High School. Recently, on July 31, 2022, Defendant Henderson set up a roadblock, stopping and unreasonably searching and seizing Black churchgoers. Plaintiffs estimate that in a town with an area no larger than 2.5 square miles, LPD has conducted at least 300 roadblocks within the past year, targeting Black people. These roadblocks are set up for no legitimate purpose other than to surveil Black drivers and passengers. In addition to giving LPD officers an opportunity to ticket and arrest Black Lexington citizens, the roadblock stops lead to LPD committing additional constitutional violations and misconduct. For instance, after stopping a woman during a roadblock and claiming she had "old fines," LPD officers handcuffed her and threw her to the ground, breaking one of her fingers. It is worth nothing that LPD has a policy of charging individuals for "old fines." As a result, the woman does not have full functionality in her finger back and she—along with many other Black Lexington citizens—is afraid to leave her home unless LPD officers are on a shift change or they do not expect LPD officers to be on patrol.

LPD has a policy of arresting and charging Black Lexington citizens for minor traffic violations. In one instance, LPD officers even arrested a man for a traffic violation while he was inside shopping in a convenience store and ticketed the man's mother even though she was not even present in the state of Mississippi at the time. LPD officers then targeted the same man for multiple traffic violations, including during times in which he did not have access to a car. In another instance, when an individual entered LPD's police station to inquire about a relative's charges, LPD illegally searched his vehicle that was parked outside.

LPD has a policy of imposing fines on Black Lexington citizens that must be paid in cash. Upon information and belief, Defendant Dobbins promised Lexington City Officials that he would generate more fines in order to bring more revenue into the city. LPD obtained this revenue by violating Black Lexington citizens' constitutional rights and fining them for it. LPD has a history of requiring arrestees to pay their bail and fees in cash before they can be released from custody. For instance, when a mother went to pick up her minor child from the police station, LPD required her to pay a $30 traffic ticket from 2010 in cash before they allowed them to leave.

Not only do the LPD officers committing constitutional violations and misconduct go uninvestigated and undisciplined, but the senior law enforcement officers at LPD condone, endorse, and in some cases, participate in, this behavior. Defendant Henderson, in his individual capacity, reportedly told Defendant Dobbins which charges to bring after falsely arresting individuals and explained how to set the bonds stemming from these false arrests. In fact, Defendant Henderson was often the officer dispatched to conduct wrongful arrests while Defendant Dobbins stayed behind at the police station. Despite illegal searches and seizures, false arrests, arrests for minor traffic violations, cash fines, and the use of roadblocks to

perpetrate these searches, seizures, and arrests against Black Lexington citizens, LPD refuses to take any action to provide additional training or supervision or investigate or discipline its officers.

*Retaliation*

Under the leadership and direction of first Defendant Dobbins, and now Defendant Henderson, and pursuant to LPD's policies, practices, and customs, LPD has not only retaliated against Black Lexington citizens who have complained about LPD's misconduct, as described in detail below, but has retaliated against LPD officers who have reported misconduct or refused to commit constitutional violations or misconduct. For instance, officers have reported seeing other LPD officers pull individuals from the backs of their patrol cars and brutally physically assault them. One officer even witnessed Defendant Dobbins, then-Chief, kick a handcuffed suspect in the head. Upon information and belief, 23 officers have resigned from LPD within the past year or so. At least four officers have reported that they were forced out of LPD because they refused to commit constitutional violations. Despite the high number of LPD officers resigning from the department and officers coming forward with information about constitutional violations and misconduct, LPD refuses to take any action to provide additional training or supervision or investigate or discipline its officers.

*Lack of Training and Certification*

Under the leadership and direction of first Defendant Dobbins, and now Defendant Henderson, and pursuant to LPD's policies, practices, and customs, LPD has failed to properly vet, hire, and train officers and has failed to confirm officers are certified. Many of the officers who have worked at LPD lacked certification at the time of hire and failed to obtain it post-hire. Despite the clear need for additional training, as described above, the need for improved hiring

practices, and the lack of certification of its officers, LPD refuses to take any action to improve its practices or provide additional training.

***City of Lexington***

The City of Lexington maintains an ongoing pattern, practice, or custom of deliberate indifference to, ratification of, and active support of LPD's ongoing misconduct. Black Lexington citizens—at great personal risk to their own safety—have made it clear through a series of complaints filed with the Mayor of Lexington and Lexington's Board of Aldermen that LPD is engaged in an ongoing pattern of constitutional violations and misconduct. The complaints detail the ways LPD routinely targets, harasses, threatens, assaults, and falsely arrest Black Lexington citizens. On June 29, 2022, civil rights attorneys from JULIAN and ACLU-Mississippi who had been investigating the police crisis in Lexington, met with Lexington's City Attorney, Katherine Barrett Riley, to discuss LPD's targeting, harassment, assaults, and civil rights violations, but she just made excuses for LPD's behavior that the civil rights attorneys found clearly pretextual.

Black Lexington citizens have been paralyzed with fear after being targeted and harassed by LPD and many are afraid to speak to civil rights attorneys or activists for fear of retaliation from LPD while others will only do so in the privacy of their own homes or outside of the city limits. In one instance, a citizen relocated her entire family to Memphis, Tennessee to escape LPD's targeting and harassment. Yet, despite Lexington City Officials being aware of LPD's constitutional violations, misconduct, and retaliatory actions, they have failed to take any steps to provide additional supervision or discipline officers. Even in the wake of Defendant Dobbins, then-Chief of LPD, making national news for his racist and homophobic remarks and bragging about killing citizens, the City still refuses to address and correct LPD's ongoing pattern of

constitutional violations. Instead, the City opted to remove public comment from its board meetings, preventing concerned citizens from speaking out against LPD's misconduct and the City's inaction.

The City's endorsement of LPD's ongoing constitutional violations and misconduct is evidenced by the closed and abusive proceedings in Lexington's Municipal court. Judge Marc Boutwell, who has the authority to dismiss unconstitutional charges, has presided over the cases of dozens of individuals targeted by LPD in the past six months and has consistently upheld LPD's unconstitutional charges, fines, and excessive bail amounts in those cases. Additionally, in the past four months, during a time period when the state of Mississippi had no Covid-19 requirements, Judge Boutwell has allowed LPD to close court proceedings without notice to almost anyone except the accused, in an effort to conceal from the media and the bar his role in sanctioning constitutional violations. Judge Boutwell has even allowed LPD to lock the courthouse door when court is in session to prevent anyone from entering. When questioned about why the proceedings were closed, Judge Boutwell invoked Article 3, Section 26 of the Mississippi Constitution, which allows the court to exclude "all persons [from the courtroom] except such as are necessary in the conduct of the trial" in cases where individuals are being prosecuted for "rape, adultery, fornication, sodomy or crime against nature." However, there were no such cases of that nature on the docket that day.

Further, Judge Boutwell himself has harassed Black Lexington citizens. On August 11, 2022, he used his position to harass a Black attorney who sat silently in the back of the courtroom, observing proceedings. After that attorney had gone outside to speak with an individual who had been targeted by LPD, Judge Boutwell sent LPD to bring the attorney back into courtroom where he commanded that she stand before him as he questioned her insolently

and without cause or basis about why she was there. When the attorney challenged Judge Boutwell on the basis and relevance of his abusive questioning, he threatened to hold that attorney in contempt of court for "smirking." Of note, court was no longer in session when Judge Boutwell commanded the attorney's presence and issued the contempt threat. Upon information and belief, after the attorney had left, Judge Boutwell immediately called a White attorney whom he believed the Black attorney worked for and told him that the Black attorney had "acted a fool" in his courtroom in an attempt to get that attorney reprimanded. In stark contrast, only one hour earlier, Judge Boutwell had greeted White attorneys in his courtroom with dignity, respect, and kindness.

The City's endorsement of LPD's ongoing misconduct is even evidenced by other instances in which attorneys were prevented from gaining access to information as well as physical access to the courtroom. For instance, attorneys attempting to obtain information about LPD's targeting and harassment have been stonewalled by LPD and court clerks. Further, court dates have been changed in an attempt to interfere with how attorneys are able to represent their clients. When attorneys are given the correct court date and show up to the courthouse to represent their clients, they have been barred from entering the court room. In one case, Defendant Dobbins, then-Chief of LPD, physically blocked an attorney from entering the courtroom and threatened to arrest her when she tried to enter. When the attorney contacted the office of the Attorney General of Mississippi, Lynn Fitch, for assistance, she was told that their office did not have jurisdiction.[10] The same attorney spoke with the Mayor of Lexington, Robin McCrory, about LPD preventing individuals from entering courtrooms and was told that

---

[10] It is worth noting that the most powerful family in Lexington, the Barretts, has donated tens of thousands of dollars to Attorney General Fitch's campaign. One member of the Barrett family, Katherine Barrett Riley, currently serves as the City Attorney for Lexington.

jurisdiction rested with Lexington's city judge. However, when the attorney spoke to the city judge, she was told that it was the LPD Chief's decision on who to allow into the courtroom.

In the case of at least one Lexington City Official, they have not only been complacent in the mistreatment of Black Lexington citizens but have actively engaged in the targeting of, harassment of, and retaliation against Black individuals who have spoken out about LPD's constitutional violations and misconduct. On August 11, 2022, around the same time that Judge Boutwell called the Black attorney before the court in an abuse of power, Lexington Alderman Charles Earl Simmons, one of the two aldermen who voted against terminating Defendant Dobbins, attempted to run over one of JULIAN's community organizers with his pickup truck in an act of retaliation. Alderman Simmons harassed and stalked another JULIAN community organizer, taking photographs of vehicles outside her office—a space where she often stays alone. Alderman Simmons has also called the employers of both organizers in an effort to get them reprimanded. Both organizers have filed criminal charges against him. Alderman Simmons has abused his position as a city official to retaliate against organizers who worked to correct LPD's constitutional violations. Upon information and belief, Alderman Simmons personally requested that LPD target and harass Plaintiffs Robert and Darius Harris who live in his ward, less than a quarter of a mile from his home. It is worth noting that, upon information and belief, Alderman Simmons and Defendant Dobbins have a close relationship. In short, no one in the City is holding LPD officers, court clerks, judges, aldermen, and other government employees in the City accountable for their mistreatment of Black Lexington citizens.

***Plaintiffs Robert and Darius Harris***

LPD targeted, assaulted, and falsely arrested Plaintiffs Robert and Darius Harris on New Year's Eve 2021. LPD has a history of targeting and harassing the brothers. The brothers were

shooting fireworks at Robert Harris' residence during a New Year's Eve celebration when LPD officers arrived and threatened to arrest them for allegedly violating the City's fireworks ordinance. Notably, the conduct that the officers cited as violating the law was not prohibited by the ordinance that the officers had referenced. Both Robert and Darius, exhausted by LPD's constant harassment, told the officers, including Defendant Dobbins, to vacate their premises. The brothers, still standing on private property, unarmed, and posing no imminent threat to the officers, themselves, or anyone else, verbally resisted the officers' threats of arrest. Robert had just held up his hand toward the officers in a plea for them to stand down when suddenly and without warning, an officer tased Darius, striking him in the chest and abdomen in an act of excessive force. Darius fell to the ground, writhing in agony. Defendant Dobbins stood over him while the electricity was still coursing through his body and commanded him to put his hands behind his back—a command that was impossible for Darius to fulfill at that moment. He continued to roll and scream on the ground as Defendant Dobbins looked down and shined his flashlight in his face. The LPD officers then proceeded to arrest him. After Darius was arrested and jailed, officers held him for a cash fee of $35.00. When Robert Harris went to the police station to inquire about his brother, Defendant Dobbins told him to "shut up" and "leave." When Robert did try to leave, Defendant Dobbins grabbed his arm and twisted it, pulling it behind his back, and detained him. Defendant Dobbins brought Robert to his office and told him that if they kept "bumping heads," there would be a "killing." Robert was scared for his life.

LPD officers violated Darius's right to free speech under the First Amendment on New Year's Eve simply because the officers did not like the stance the brothers took against them. Moreover, LPD officers violated Darius's Fourth Amendment right against unreasonable search and seizure and his right to be free of excessive force. Darius experienced severe pain when the

barbs from the taser were removed—over an hour after he was tased—and he continues to have

back pain as a result of the tasing. LPD officers similarly violated Robert's right to free speech

under the First Amendment for merely inquiring about his brother's arrest, and Defendant

Dobbins violated Robert's Fourth Amendment right against unreasonable search and seizure and

his right to be free of excessive force by forcibly arresting and detaining Robert when he posed

no danger and was not suspected of any criminal activity.

On April 7, 2022, the Lexington community held a "Know Your Rights" meeting to

express their grievances against LPD. Both Robert and Darius attended that event and spoke

openly to the audience about their experience with LPD on New Year's Eve. Known friends of

LPD officers attended the event. Within 24 hours of the meeting ending, LPD officers falsely

arrested Robert and Darius again. LPD charged the brothers with the felony of "retaliation

against an officer" and possession of marijuana. Robert, a respected anti-drug activist, reports

that he witnessed an officer plant drugs in his vehicle. LPD also alleged that the brothers had

outstanding warrants but refused to provide copies of said warrants.

On or about April 11, 2022, Darius was escorted to the police station by a local activist to

collect paperwork regarding his arrest, charges, and court dates, but LPD officers refused to

provide any information. During this exchange, LPD officers became ill-mannered and forceful,

resulting in Darius's departure. Although Darius usually visits Robert in Lexington several times

per week, since his false arrest, he has tried to avoid entering the city out of fear that he will

again be targeted, assaulted, and arrested.

In addition to these instances of retaliation, Plaintiffs have been subjected to

discriminatory treatment at the hands of LPD that was motivated by racial animus. For instance,

Robert has been subject to disparate enforcement of municipal laws. LPD officers ticketed cars

parked in Robert's yard following the New Year's Eve incident and in the yards of other Black Lexington citizens, giving them 24 hours to move them or else get towed. Some residents lost vehicles to LPD and were without transportation for weeks. In contrast, Defendant Dobbins reprimanded an officer when that officer ticketed cars at the homes of White Lexington citizens.

***Plaintiff Peter Reeves***

Similar to Robert and Darius Harris, Plaintiff Peter Reeves has been subject to false arrest in retaliation for expressing critical views about LPD and subjected to racially discriminatory enforcement of laws. In March 2022, Mr. Reeves was arrested after traveling through a roadblock setup by LPD at approximately 2:00 a.m. LPD charged him with felony possession of a controlled substance because he had a Tylenol bottle in his vehicle even though Tylenol is not a controlled substance. Mr. Reeves often transports his uncle, a Vietnam war veteran, to and from doctor's appointments. The medicine had been prescribed to his uncle for chronic pain. In the weeks leading up to his arrest, Mr. Reeves had criticized an LPD officer on social media. That same officer targeted Mr. Reeves in the roadblock in retaliation for Mr. Reeves' comments.

After arresting Mr. Reeves, LPD officers called a tow truck driver to tow his car. When the tow truck driver arrived on the scene, he informed the officers that he could take the vehicle to Mr. Reeves's home instead of towing it to a lot. The officers became enraged and assaulted the tow truck driver by slamming him against his towing vehicle twice and exclaiming, "Do the f*cking job we called you to do!" Sitting in the back of a police vehicle for approximately 40 minutes, Mr. Reeves witnessed authorities arrest multiple Black drivers at the roadblock while allowing White drivers to pass through unstopped. LPD violated Mr. Reeves's First Amendment right to be free from retaliation for exercising his protected First Amendment right to free

speech, his Fourteenth Amendment right to equal protection, his Fourth Amendment right to be free from unreasonable search and seizure and false arrest, and his right to travel freely.

***Plaintiff Eric Redmond***

On June 3, 2022, LPD violated Plaintiff Eric Redmond's First and Fourth Amendment rights by arresting him without probable cause in retaliation for him asking questions about his sister's bail being increased and using force to affect the arrest that was not proportionate to any threat or resistance. Mr. Redmond received a call at night from his brother informing him that LPD officers had arrested his sister. Immediately, Mr. Redmond went to the scene but was notified that his sister had already been detained and taken to the precinct. Upon arriving at the precinct, Mr. Redmond parked on a private lot near the precinct in an attempt to not block any traffic. Once Mr. Redmond entered the precinct, he received a phone call from his sister explaining to him that she needed $700.00 to be released from jail. As Mr. Redmond was leaving the precinct, he received a second call from his sister notifying him that LPD had changed the bail from $700.00 to $2,000.00. Mr. Redmond immediately asked to speak with the Chief of Police, Defendant Dobbins at the time, to discuss why the bail amount had changed. The arresting officer refused to let Mr. Redmond speak with the Chief.

Mr. Redmond, standing outside of the precinct and waiting to speak with the Chief, was approached and ordered to leave the premises by a visibly angry LPD officer. Defendant Dobbins then walked outside and commanded the officer to detain and arrest Mr. Redmond. The officer pulled out his taser and said "I'm gonna blast your a**."  LPD did not explain the reason for the arrest, state the charges, or read Mr. Redmond his Miranda rights. When Mr. Redmond arrived at Holmes-Humphreys Regional Correctional Facility, he was informed that he had been charged with disorderly conduct and resisting arrest. It was approximately eight hours before he

was notified of the amount of his bond. While he was detained, LPD officers had Mr.

Redmond's vehicle towed without notifying him or requesting his consent.

***Plaintiff Malcolm Stewart***

Plaintiff Malcolm Stewart, a participant in the April 7th "Know Your Rights" community

meeting, was arrested two days after the meeting in violation of his First Amendment and Fourth

Amendment rights. LPD officers claimed that Mr. Stewart had outstanding fines and a warrant

for his arrest. However, they never showed Mr. Stewart the warrant and the judge said he did not

sign it. Mr. Stewart, a mechanic, had made an agreement with the City Judge and former Chief

of Police, Defendant Dobbins, the previous year, stipulating that he would work off all of his

then-existing outstanding fines by servicing LPD's vehicles. Mr. Stewart worked off his fines for

approximately a year and a half. He was notified by the clerk on his final day of work on a

Friday in July 2021 that his fines were paid in full. However, after voicing his concerns at the

community meeting, LPD officers claimed the fines were still due and arrested him. Various

activists traveled to Holmes-Humphreys Regional Correctional Facility to pay Mr. Stewart's

fines so that he could be released from custody, but even with cash in hand, LPD officers refused

to release Mr. Stewart that night and did not release him from custody until the next day.

On or around March 4, 2021, Lexington's now-Interim Chief, Defendant Henderson,

threatened to kill Mr. Stewart as he sat in his car on private property simply because Mr. Stewart

had refused to leave the premises. Defendant Henderson told Mr. Stewart that he was working

that night and did not want "nobody" out. Mr. Stewart opposed Defendant Henderson's order

because the property's owners had not issued the request. Defendant Henderson then threatened

to arrest Mr. Stewart for "disobeying a direct order." Defendant Henderson then told Mr.

Stewart, "If you don't get the f*ck off this lot, your family gone be wearing a Black suit or a

Black dress by Sunday." Defendant Henderson was targeting and harassing Mr. Stewart in retaliation for Mr. Stewart voicing his concerns about LPD.

LPD officers targeted Mr. Stewart again on July 30, 2022, violating this Fourth Amendment rights to be free from illegal search and seizure and excessive force. As he was sitting inside his parked vehicle in front of his sister's home in Lexington, LPD officers approached the vehicle, reached in, and yanked his shirt collar, pulling him through the window. Up to this point, Mr. Stewart, sitting stationary in his parked vehicle, had observed all traffic laws and regulations, had not interfered with traffic in any manner, and had proceeded in an orderly and peaceful manner as he spoke with his sister from the car. Officers arrested him on charges of driving under the influence. According to Mr. Stewart and eyewitnesses, Mr. Stewart was not intoxicated and even though he repeatedly requested that officers administer a breathalyzer, LPD officers refused to do so. After LPD officers took Mr. Stewart to the police station, bystanders recorded audio inside the station of Mr. Stewart screaming in pain while officers assaulted him.

LPD has also harassed other members of Mr. Stewart's family, including his daughter, son, and nephews. Indeed, after Mr. Stewart's daughter refused Defendant Henderson's romantic advances, Defendant Henderson began harassing her, citing her for a traffic violation as she stood outside her car at a private car wash, vacuuming it. It is worth noting that more than a dozen women have reported to civil rights organizations and city staff that Defendant Henderson has propositioned them for sex and proceeded to ticket or arrest them when they refused. One woman reported being detained for three months after denying Defendant Henderson's advances. On several other occasions, Defendant Henderson approached Mr. Stewart's daughter at stores and forced her to leave based on alleged crimes he made up on the spot, such as "taking too

long" to get out of her car. In another instance, he threatened to arrest her for getting out of her car after he himself had directed her to exit the vehicle. Many of Mr. Stewart's family members avoid driving through Lexington altogether now due to LPD's constant harassment.

## **LEGAL STANDARD**

TRO and preliminary injunction are proper because Plaintiffs can establish (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disservice the public interest. *See* FED. R. CIV. P. 65(b); *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009) (setting forth a four-part test to determine whether injunctive relief should issue).

Moreover, a preliminary injunction is appropriate to enjoin a law enforcement agency from committing constitutional violations where there is evidence that the challenged conduct is part of a persistent pattern and practice of misconduct that presents a realistic threat of continuing in the immediate future.

## **ARGUMENT**

### I.    **Plaintiffs Are Substantially Likely to Prevail on The Merits of Their Claims.**

To establish a substantial likelihood of success on the merits, "the plaintiff must present a prima facie case, but need not prove that [they are] entitled to summary judgment." *See Daniels Health Scis., L.L.C. v. Vascular Health Scis.*, L.L.C., 710 F.3d 579, 582 (5th Cir. 2013). Here, Plaintiffs can establish a *prima facie* case for their Fourth Amendment search and seizure, Fourteenth Amendment Equal Protection, and First Amendment retaliation claims asserted against Defendants.

A. *Plaintiffs Are Substantially Likely to Prevail on Their Fourth Amendment Search and Seizure Challenge to Defendants' Roadblock Policies.*

Roadblock checkpoint programs that have the primary purpose of general crime control violate the Fourth Amendment. *See Edmond v. City of Indianapolis*, 531 U.S. 32, 44 (2000). Checkpoints instituted for the purpose of deterrence of drug activity are similarly unconstitutional. *Delaware v. Prouse*, 440 U.S. 648, 659 n. 18 (1979). Roadblocks erected for other purposes are subject to a balancing test weighing the reasonableness of the checkpoint against the intrusion on Plaintiffs' rights. *Collins v. Ainsworth*, 382 F.3d 529, 544 (5th Cir. 2004). Sweeping policies that subject a significant number of people to scrutiny at roadblocks are often unreasonable even if they advance a legitimate government aim. *See e.g., Ratliff v. City of Houston*, 2005 U.S. Dist. LEXIS 39410 at *59 (S.D. Tex. 2005)(finding a Houston Police Department practice of frequently detaining all individuals in a several block area for driver's license and vehicle registration checks violated the Fourth Amendment even though stops were purportedly to accomplish a legitimate government objective of cracking down on street racing); *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009)(substantial likelihood that the police department violated the Fourth Amendment by instituting a neighborhood safety checkpoint for 15 days over the course of the summer where officers questioned drivers about their reason for entering a neighborhood). Roadblocks erected to achieve unconstitutional goals are categorically unreasonable and amount to a 4th Amendment violation. *See Collins*, 382 F.3d at 544 (finding roadblocks erected with the purpose of discouraging attendance at a 2 Live Crew concert constituted an unreasonable seizure because the police department's ultimate goal was to violate the First Amendment); *United States v. Johnson*, 28 F. Supp. 3d 499, 516-17 (M.D.N.C. 2014)(permitting Fourth Amendment challenge to municipal checkpoints to proceed to trial

where Plaintiffs presented evidence that Sheriff erected checkpoints for the purpose of targeting

Latino drivers).

Defendants' checkpoints are exclusively set up in predominantly Black segments of

Lexington. In particular, LPD will regularly set up checkpoints near Black Holmes Central High

School during school events. At checkpoints, Black drivers are disparately selected for stops

while white drivers are waived through without further scrutiny. Police do not conduct sobriety

tests or other road safety inquiries at these stops. These tests are also not conducted during times

of day or in locations where LPD would have heightened concerns about drunk driving or road

safety. For instance, the most recent roadblock took place on Sunday July 31, 2022 and targeted

Black churchgoers.

The most generous primary purpose that can be ascribed to Defendants' checkpoints is

general crime control or drug interdiction. However, evidence about location, frequency, and

methods used at these roadblocks reveals that racial harassment is the primary purpose with a

possible secondary impermissible purpose of revenue generation through the issuing of fines.

Even if this Court is not persuaded that Defendants' roadblocks are conducted for the purpose of

harassing Black Lexington residents, they at the very least are motivated by impermissible

general crime enforcement objectives and violate the Fourth Amendment.  Accordingly, even if

Defendants' roadblocks are examined in the most generous light, Plaintiffs are substantially

likely to succeed on the merits.

   B.  *Plaintiffs Are Substantially Like to Prevail on Their First Amendment Retaliation Claim.*

To prevail on a First Amendment claim, a plaintiff must prove that they engaged in

constitutionally-protected activity, the government responded with retaliation that would chill a

person of ordinary firmness from continuing to engage in the protected activity, and the

protected activity caused or was a motivating factor in the retaliation.  *Hartman v. Moore*, 547

U.S. 250, 256 (2006); *Nieves v. Bartlett*, 139 S. Ct. 1715 (2019).  Plaintiffs can make a clear

showing on all three elements.

First, Plaintiffs Robert Harris, Darius Harris, Malcolm Stewart, and Peter Reeves each

engaged in protected speech. Robert Harris and Malcolm Stewart engaged in protected

petitioning activity when they filed formal complaints against the police with the city. Mr.

Stewart and the Harris brothers also engaged in protected First Amendment activity when they

attended the April 7, 2022 community meeting to talk about their past experiences with LPD a

day prior to their arrests.  Peter Reeves engaged in protected speech when he made a Facebook

post criticizing the police officer that would eventually arrest him in March 2022.

Second, arrests and ongoing harassment and threats are precisely the type of retaliatory

conduct that would chill a person of ordinary firmness. *See e.g., Keenan v. Tejeda*, 290 F.3d 252,

259 (5th Cir. 2002)(finding a baseless, lengthy detention by a police officer and misdemeanor

charges would chill a person of ordinary firmness); *Peterson v. Kopp*, 754 F.3d 594, 602 (8th

Cir. 2014)(finding an unjustified arrest would chill a person of ordinary firmness). "Ordinary

firmness" is an objective standard that will not "allow a defendant to escape liability for a First

Amendment violation merely because an unusually determined plaintiff persists in his protected

activity." *Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999).

Accordingly, even though Plaintiffs have continued to engage in protected activity—including

filing this lawsuit[11]— to oppose LPD's misconduct, they can still demonstrate Defendants'

retaliatory actions satisfy the second prong of the First Amendment retaliation analysis.

---

[11] *See e.g., DeMartini v. Town of Gulf Stream*, 942 F.3d 1277 (11th Cir. 2019). Given Defendants'
extensive history retaliating against anyone who opposes their unconstitutional actions, Plaintiffs fear
they will face retaliation for their participation in this lawsuit. This fear animates Plaintiffs' decision to

Third, Plaintiffs' protected petitioning and protest activities were clearly the motivating factor behind the arrests and harassment they experienced. The temporal proximity of the arrests and plaintiffs' protected activity is strong circumstantial evidence of retaliatory animus to support a *prima facie* claim for retaliation. *See Hayes v. LaForge*, 113 F. Supp. 3d 883, 904 (N.D. Miss. 2015); *Washington v. Afify*, 681 Fed. Appx. 43, 46 (2d Cir. 2017)(finding temporal proximity between protected activity and adverse action provide circumstantial evidence of retaliation); *Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 209 (6th Cir. 2010)("direct or circumstantial evidence, including showing temporal proximity between engaging in protected activity and suffering an adverse employment action, that may create an inference of causation"). Similarly, a lack of probable cause for the crime a plaintiff is arrested also supports a finding of a discriminatory animus. *Hartman*, 547 U.S. at 261 ("demonstrating that there was no probable cause for the underlying criminal charge will tend to reinforce the retaliation evidence"); *see also Haverda v. Hays Cnty.*, 723 F.3d 586, 595 (5th Cir. 2013)(evidence of retaliatory motive where defendants' reasons for adverse actions lack credibility).

While Defendants had pretextual reasons for arresting the Harris brothers within a day of the April 7th meeting, LPD lacked probable cause for the alleged crimes of felony "retaliation against an officer" and marijuana possession. Similarly, the arrest of Mr. Stewart for unpaid fees lacked probable cause since he had paid his debt in full almost a year earlier. Mr. Reeves's arrest also was made in absence of probable cause since he was arrested for controlled substance possession despite merely having Tylenol.

C. *Plaintiffs Are Substantially Likely to Prevail on Their Fourteenth Amendment Equal Protection Claim.*

_____

pursue a TRO and the high likelihood of retaliation that will stem from this action should be considered in analyzing the potential irreparable harm Plaintiffs face.

A plaintiff makes out a *prima facie* claim of race discrimination in violation of the Fourteenth Amendment of the Equal Protection clause by showing that they received different treatment from similarly situated individuals and that the differential treatment stemmed from discriminatory intent. *See Priester v. Lowndes Cnty.*, 534 F.3d 414, 424 (5th Cir. 2004); *Lewis v. Ascension Parish School Bd.*, 662 F.3d 343, 348–49 (5th Cir. 2011). Discriminatory intent can be shown by utilizing either (i) the *Arlington Heights* framework to establish a facially-race neutral policy was adopted with a discriminatory purpose, or (ii) the *McDonnell Douglas* framework to establish a *prima facie* case that plaintiff was a member of a protected class, suffered adverse action, and was treated less favorably than similarly situated individuals. *See, e.g., Rollerson v. Port Freeport*, No. 3:18-cv-00235, 2019 U.S. Dist. LEXIS 157165, at *14–16 (S.D. Tex. Sept. 13, 2019).

The *Arlington Heights* inquiry includes five non-exhaustive factors to determine whether a particular decision was made with a discriminatory purpose: (1) the historical background of the decision, (2) the specific sequence of events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) the challenged practice's history, especially where there are contemporary statements by members of the decision-making body. *Veasey v. Abbott*, 830 F.3d 216, 230–31 (5th Cir. 2016). The *McDonnell Douglas* framework provides that a plaintiff can establish a *prima facie* case of discrimination by demonstrating "(1) they are members of a protected class; (2) they suffered adverse action; and (3) they were treated less favorably than similarly situated individuals." 411 U.S. 792, 802–03 (1973).

Plaintiffs can show a number of the LPD practices they seek to enjoin violate the Fourteenth Amendment under both frameworks. LPD's checkpoints are exclusively set up near

and around locations hosting events that are largely attended by Lexington's Black community and in residential areas where residents are majority Black. There is also significant circumstantial evidence that the reason behind the increase in use of the checkpoints, which coincided with Defendant Dobbins becoming LPD's police chief, is racially motivated.  First, LPD's current roadblock practice represents both a procedural and substantive departure from how checkpoints were used prior to Defendant Dobbins' tenure. While LPD used checkpoints prior to 2021, they were not staged outside of Black school and church events. [affidavit]. Checkpoints were not erected nearly as frequently and when they were in place, it was to detect a specific fleeing suspect or other special purpose. Moreover, Defendant Dobbs, the executive who was responsible for increased use of roadblocks, has a documented history of anti-Black racism that supports a finding of racial animus.

The roadblocks are also unconstitutional under a *McDonnell Douglas* framework. Black Lexington residents—including Plaintiff Reeves—are members of a protected class, who are subject to an adverse action in the form of arrests or seizures at roadblocks and endured worse treatment than White Lexington residents that were stopped at the roadblock. In particular, during Reeves's March 2022 stop, white drivers were permitted to pass through the checkpoint unbothered while Reeves and other Black drivers were detained, questioned, and arrested. Reeves, in particular, was arrested for drug possession when all he had was a bottle of Tylenol. Regardless of which analysis this Court uses, Plaintiffs can show a substantial likelihood of success on the merits of their Fourteenth Amendment claim as it relates to Defendants' roadblock policies.

Plaintiffs can also show that LPD's practices around arrests, retaliation, and uses of force violate the Equal Protection Clause. First, Black Lexington residents are disproportionately

targeted for stops and arrests. In the last year, LPD has arrested only seven white Lexington residents. By contrast, LPD has arrested hundreds of Black Lexington residents. Further, a substantial percentage of arrests of Black Lexington residents have been for alleged violations that would normally warrant a ticket, including driving without a license, whereas the arrests of white drivers were all for serious violations of the traffic code. In addition to these disparities, there is significant circumstantial evidence that these disparities are the result of a concerted LPD practice to target Black Lexington residents. As discussed above, the mistreatment Plaintiffs and other Black residents have experienced under Defendant Dobbins and then Defendant Henderson's tenure is a significant escalation from any mistreatment that they had experienced in the past. Based on community complaints, retaliatory arrests, incidents of use of unnecessary force, and other forms of police harassment spiked in 2021 and 2022. Moreover, Defendants' unconstitutional activity is a departure from their written procedures and past conduct. Finally, Defendant Dobbins' audio reveals that animus imbued his views on use of force and undoubtedly seeped into other areas of his policymaking and leadership philosophy.

## II.    Plaintiffs Will Suffer Irreparable Harm if An Injunction Is Not Entered.

To demonstrate the irreparable harm, Plaintiffs "need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir.1986). A violation of constitutional rights, even temporarily, amounts to irreparable harm for purposes of the preliminary injunction analysis. *See, e.g.*, *Elrod*, 427 U.S.347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"); *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 295 (5th Cir. 2012)(when "an alleged deprivation of a constitutional right is

involved, most courts hold that no further showing of irreparable injury is necessary")(quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (2d ed. 1995)).

Moreover, as conveyed in the accompanying Complaint, failing to grant this requested injunction will irreparably harm Lexington's citizens in tangible ways beyond the violation of their rights. Hardworking taxpayers are having to spend their limited resources to pay off or defend baseless charges that flow from Defendants' roadblocks. Victims are having to pay medical bills after LPD has beaten them in the course of a retaliatory arrest. Others are so afraid of LPD that they do not leave their homes during certain times, thereby impacting their jobs and their families as LPD violates their right to travel. On a more global level, Lexington is on the brink of a race riot, and police are emboldened enough to take someone's life without reason and brag about it. If nothing is done, we fear that lives will be lost.

A. *It is necessary to compel the City of Lexington to request police assistance from the Governor of Mississippi to protect Black citizens from LPD.*

Plaintiffs are entitled to be protected by the law enforcement agencies of the State of Mississippi against hazards to their public safety. See, *Williams v. Wallace,* 240 F. Supp. 100, 109 (M.D. Ala. 1965) ("These plaintiffs and the members of the class they represent are entitled to police protection in the exercise of [their] constitutional rights."); *Hague v. C. I. O.* (1939), 307 U.S. 496, 59 S. Ct. 954, 83 L. Ed. 1423; *Kelly v. Page* (5th Cir. 1964), 335 F.2d 114; *Downie v. Powers* (10th Cir. 1951), 193 F.2d 760; *United States v. Klans* (M.D.Ala.1961), 194 F. Supp. 897. If this Court compelled the City of Lexington to request assistance from the state, Governor Tate Reeves would be within his power to issue such assistance. The mayor of any municipality may request that the Governor, by signed proclamation, deploy the Highway Safety Patrol when they anticipate certain circumstances. Mississippi Code § 45-3-21 states:

(a) When requested by the sheriff or board of supervisors of any county or the mayor of any municipality on the grounds that mob violence, crimes of violence, acts and conduct of terrorism, riots or acts of intimidation, or either, calculated to or which may provoke violence or incite riots, mobs, mob violence, violence, or lead to any breach of the peace, or either, and acts of intimidation or terror are anticipated, and when such acts or conduct in the opinion of the Governor or Acting Governor would provoke violence or any of the foregoing acts or conduct set out in this subsection, and the sheriff or mayor, as the case may be, lacks adequate police force to prevent or suppress the same. …

(c) The Governor or Acting Governor is hereby authorized and empowered to issue his proclamation invoking the powers and authority vested by this paragraph, as provided in paragraphs (a) and (b) of this subsection, and when the Governor or Acting Governor issues said proclamation in accordance herewith, said proclamation shall become effective upon the signing thereof and shall continue in full force and effect for a period of ninety (90) days, or for a shorter period if otherwise ordered by the Governor or Acting Governor. At the signing of the proclamation by the Governor or Acting Governor, the Department of Public Safety and its officers and employees shall thereupon be authorized to exercise the additional power and authority vested in them by this paragraph. Miss. Code. Ann. § 45-3-21 (West).

The crisis in Lexington meets the requirements of § 45-3-21. There has already been mob violence. The police officers are the gang of the town, attacking Black citizens randomly, consistently, and without cause. There have already been violent crimes. A Lexington alderman allegedly attempted to run over a civil rights organizer with his pickup truck only last week. There have already been acts of intimidation. Not only have Defendants intimidated Black citizens, but they continue to do so. Defendant Dobbins, now terminated, still patrols the Black community in the passenger seat of police vehicles with on-duty LPD officers, intimidating Black residents. As a result of these and other acts committed by Defendants, the Black residents of Lexington are in silent uproar and most Black citizens remain in constant fear for their lives when they leave their homes. Others have realized that not even their homes are safe. Defendants' actions meet the standard for deploying the Highway Patrol. Therefore, if the Mayor of Lexington, Robin McCrory, requested assistance from Governor Tate Reeves to protect Black

Lexington citizens, the Governor would have sufficient grounds to issue that protection for up to 90 days.

The Governor's power to deploy state law enforcement forces to Lexington is granted by Article V, § 119 of the Mississippi State Constitution, which states that "[t]he governor shall be commander-in-chief of the army and navy of the state, and of the militia, except when they shall be called into the service of the United States."

Moreover, within his power as commander-in-chief, the Governor may deploy investigators under § 7-1-19 of Mississippi's Code. He has the power to "organize, equip, train, and maintain" the Mississippi State Guard "in such strength…as he may deem advisable" under § 33-5-51, and he has the power to direct the highway patrol under § 45-3-21 (1)(c), which states, **"**When so directed by the Governor, to enforce any of the laws of this state upon any of the highways or public roads thereof." Indeed, the Mississippi National Guard's own website lists its mission as "[providing] protection of life and property, and uphold the preservation of peace, order, and public safety for the citizens of Mississippi, under the leadership and control of the governor."[12]

Therefore, if this Court were to enjoin Defendants' unconstitutional acts and compel the City of Lexington to request the assistance of Governor Reeves through a TRO, the Governor would have multiple state law enforcement agencies at his disposal. As the court stated in *Williams*, "[T]his matter as now presented is not a question of the State… not having the resources and manpower to keep down disorder and violence since the governor has multiple law enforcement bodies at his disposal. The only question that is now presented is whether the

---

[12] "Brief History of the MSNG," Mississippi National Guard, https://ms.ng.mil/history/Pages/Brief-History-of-the-MSNG.aspx

State…authorities are willing to employ their available resources" to preserve peace and order and whether this Court will order Defendants to request such assistance.

The Fifth Circuit Court of Appeals upheld a more expansive TRO request for a similar deprivation of rights by law enforcement in *Williams v. Wallace*, 240 F. Supp. 100 (M.D. Ala. 1965). In *Williams*, Attorney Fred Gray filed a request for a TRO and a preliminary injunction in after Alabama state troopers and sheriffs' deputies beat civil rights activists at the foot of Selma's Edmund Pettus Bridge. In *Wallace*, the Middle District of Alabama enjoined the Governor of Alabama, the Director of Public Safety, and law enforcement from intimidating, threatening, coercing, or interfering with" the plaintiff's constitutional rights. The court further issued an injunction, commanding the Defendants to protect civil rights activists by deploying forces to stand guard in case others sought to violate the plaintiffs' rights.

The court in Wallace found that Attorney Gray's TRO request was "reasonable" in part because it was in exercise of the constitutional right to freedom of movement within the state of Alabama. "The court further held that the plaintiffs were entitled to police protection as they exercised their constitutional right[s.]" *Williams v. Wallace*, 240 F. Supp. 100 (M.D. Ala. 1965); Fred Gray, *Bus Ride to Justice*, Revised Edition, NewSouth Books, 176 (1995).

By analog, the constitutional wrongs inflicted upon individuals within a single day in 1965 have been carried out against Lexington's Black citizens for more than a year. The stories of Peter Reeves, Robert and Darius Harris, Eric Redmond, and Michael Stewart are emblematic of a culture of targeting, corruption, and violence within Lexington's police department and broader municipal government that has effectively stripped Black citizens of their First, Fourth, and Fourteenth Amendment rights. Just as in *Williams*, LPD has "intimidated, threatened, coerced, and interfered with" Black citizens' constitutional rights.

Both Peter Reeves and Michael Stewart were on public roadways when LPD targeted, threatened, and interfered with their constitutional right to move freely within the state of Mississippi. Eric Redmond was not allowed to even walk from the street into a public building without being arrested. Like the Selma marchers, Mr. Redmond was attempting to seek redress for his grievances when LPD illegally arrested him.

The court in *Williams* set a precedent by responding to a civil rights crisis, similar to the crisis at issue here, by requiring a governor to deploy nearly 3000 officers to protect American citizens. Here, Plaintiffs request much less. Plaintiffs do not ask this court to command Mississippi's governor to act. Plaintiff's request that this court, through injunction, compel the City of Lexington to request the governor's assistance. The City of Lexington need only request 10 to 20 highway patrolmen, investigators, or Mississippi National or State guardsmen to protect its Black citizens and police the police. Given the fact that the Fifth Circuit deemed more extreme measures "reasonable" in similar circumstances, Plaintiffs' request is certainly so.

A force of no more than 10 officers are violating the Constitutional rights of hundreds. Plaintiffs' need is not large, but the ratio of Lexington's small size compared to the number, frequency, and degree of harm inflicted on its Black citizens proves that the Plaintiff's requested relief is necessary. Moreover, according to the standard established by *Williams*, they are entitled to it.

Given this crisis's extraordinary nature, Plaintiffs also do not anticipate a line of cases, calling for this level of intervention. We understand that such an injunction and protection must be granted on a case-by-case basis and serve as the exception rather than the rule. For example, *Williams v. Wallace* occurred 57 years ago. Its positive effect on the public interest helped to

31

usher in the Voting Rights Act of 1965 and set in motion a respect for equal protection and the right to travel that have only just begun to unravel in the past few years.

By issuing a TRO and preliminary injunction to quell the Lexington crisis, this Court would show this state and nation's intolerance for blatant constitutional wrongs and promote the same trust in democracy and respect for the rule of law that the Fifth Circuit guided into its renaissance with *Williams*. The City of Lexington has shown that it cannot or will not protect its Black citizens, necessitating this measure.

The Supreme Court's words in *Kelly v. Page*, 335 F.2d 114 (July 1964), ring true here. There, it stated, "there must be in cases like the one now presented, a 'constitutional boundary line' drawn between the competing interests of society. The extent of the Plaintiffs' rights should be commensurate with the enormity of the wrongs they are petitioning against. *Williams*, 240 F. Supp. at 106. In this case, the wrongs are enormous. This Court has the duty and responsibility of drawing the constitutional boundary line.

### III.   An Injunction Will Not Impose Any Harm on Defendants.

Comparatively speaking, there would be no damage to Defendants in light of the injuries threatened and suffered by Plaintiffs and other Lexington citizens. This injunction is merely requiring Defendants to cease unconstitutional practices, conduct they have no legitimate interest in continuing. *See Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010) (stating that the government "does not have an interest in enforcing a law that is likely constitutionally infirm"). At most, Defendants will be required to comply with the Constitution—something that Defendants are tasked with doing anyway. Having to do their jobs and uphold the Constitution is not damaging. The injury inflicted by Defendants, however, is. The injury to Plaintiff in the instant case is enormous while the damage to Defendants,

comparatively, is feather light. The harm Plaintiffs will suffer without an injunction far outweighs any inconvenience Defendants would experience with one.

### IV.    An Injunction Is in the Public Interest.

The public interest is served by an injunction that protects constitutional rights. *Jackson Women's Health Organization v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014); *United States v. Raines*, 362 U.S. 17, 27 (1960). We have before us a rare type of policing crisis where the uproar is not about the atrocious treatment of one person by the hands of police but, rather, the treatment of 1500 Black residents who have suffered in muffled silence for over a year. When they attempted to speak out or seek redress, they were silenced and shut down. This procedural stopgap was made for moments such as this when the public's safety is in jeopardy and nothing or no one else has stepped up to rectify the wrong.

__ /s/ Thomas J. Bellinder, Esq. _____
Thomas J. Bellinder (MSB # 103115)
**BELLINDER LAW FIRM**
200 E. Government St.
Brandon, MS 39042
Phone: (601) 487-9340
Fax: (601) 265-1795
Thomas.Bellinder@BellinderLawFirm.com