**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**ROBERT HARRIS, ET AL.**                                                    **PLAINTIFFS**

**VS.**                                **CIVIL ACTION NO. 3:22-CV-479-TSL-MTP**

**SAM DOBBINS, ET AL.**                                                      **DEFENDANTS**

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Lexington's former police chief was secretly recorded saying the N-word.  When the City became aware of the recording, it swiftly suspended the chief, called a special board meeting, and fired him.  Nonetheless, five plaintiffs — all of whom have pending charges or recent convictions — have seized on the bad publicity.  They accuse the City of discriminatory policing, even though the City now has a black police chief, an all-black police force, and is governed by a majority black board of aldermen.

The most obvious problem with Plaintiffs' preliminary-injunction brief is that it is a work of fiction.  It contains salacious allegations without supporting evidence.  For the most part, there are no citations, there are no names, and the claims are conclusory rather than specific.  Even though the City does not shoulder the burden of proof, this response proves Plaintiffs' narrative to be false.  Included are affidavits, documents, and videos, all of which contradict Plaintiffs' unfounded rhetoric.

But there are clear legal hurdles that Plaintiffs cannot satisfy, even if their motion had factual credibility.  Among them are: (1) there is no jurisdiction, (2) the law does not permit the relief Plaintiffs request, and (3) the stringent requirements for preliminary-injunctive relief are not close to being met on these facts.  For all of the reasons that will be explained in detail, Plaintiffs' motion should be denied.

# BACKGROUND

Plaintiffs begin their brief with a focus on the 1960s, an era before four of the five plaintiffs were even born.  *See* Doc. No. 8 at pp.1-3.  This is a police case, not a voting rights case.  Irrelevant evidence and over-the-top verbiage cannot lead to the "strong medicine" of preliminary-injunctive relief.  *Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004) ("Preliminary injunctions are strong medicine, and they should not issue merely to calm the imaginings of the movant.").

The real story begins in July 2021, when Sam Dobbins was appointed police chief following a municipal election.  Mayor Declaration, Ex. A.  Dobbins is white but was appointed by a majority black board of aldermen.  *Id.*  More specifically, the board is made up of four black members and one white member.  *Id.*  Three of the black members, along with the one white member, voted in Dobbins' favor.  *Id.*  Plaintiffs' complaint acknowledges that nearly 85% of Lexington's population is black.  Doc. No. 1 at ¶2.

At the time Dobbins was appointed, crime in Lexington was rampant.  Mayor Declaration, Ex. A; Chief Declaration, Ex. B.  Gunshots commonly were heard throughout the day and at night. *Id.*  Cars would drag race in the city limits without regard for traffic laws or safety.  *Id.*  To put it bluntly: things were out of control.

Dobbins viewed his charge as one of cleaning things up.  But with more arrests came complaints.  Mayor Declaration, Ex. A.  That is not surprising in police work, as "complaints against police officers are common[,]" "especially when [they are] doing . . . a good job and getting some of the right people off the street[.]"  *See Watson v. Dyersburg Police Dep't*, 2013 WL 5306683, *21 (W.D. Tenn. 2013) (reciting officer testimony that criminals "think that if you— they come up there and complain on an officer that the bosses will tell us to, you know, stay out

of that area; or don't pull people over" for violating the law).  Still, Mayor Robin McCrory took the complaints seriously and soon found herself at odds with Dobbins.

One complaint McCrory received was from a citizen named Francine Jefferson in March 2022.  Mayor Declaration, Ex. A.  Jefferson threatened that she was "preparing to bring as much outside help as possible, including NAACP & ACLU[.]"  *Id.*  Jill Collen Jefferson – Plaintiffs' lead counsel in this case – soon showed up in Lexington.  Attorney Jefferson attended Lexington Municipal Court with members of the media, and the City received various public records requests seeking information about the police department.  *Id.*; Chief Declaration, Ex. B.

In July 2022, Attorney Jefferson's organization released audio of Dobbins being secretly recorded by another police officer named Robert Hooker.  Doc. No. 1 at ¶77.  The recording is vulgar and offensive.  *See* Hooker Recording of Dobbins, Ex. C.[1]  On it, both men use derogatory language, with Dobbins using the N-word and claiming to have engaged in "justified" uses of force.  *Id.*  The conversation is believed to have taken place in April 2022, approximately four months before Attorney Jefferson's organization released it.  *Id.* (the two men discuss the next court day being in May).

When city officials learned of the recording, Dobbins was suspended, and a special meeting was called.  Mayor Declaration, Ex. A.  The meeting resulted in Dobbins' termination.  *Id.*  At the same meeting, the board appointed Charles Henderson to be the interim police chief.  *Id.*  Chief Henderson is black and so is every current member of the Lexington Police Department.  Chief Declaration, Ex. B.

---

[1] The recording has been filed conventionally on a CD with three other videos referenced herein.  Each file on the CD is labeled according to its exhibit number and description, e.g. "Ex. C – Hooker Recording of Dobbins."

PD.39737730.1

This lawsuit followed on August 16, 2022, Doc. No. 1, but, before it was filed, it was released to the press without a case caption. *See, e.g.*, https://www.mississippifreepress.org/26469/black-lexington-plaintiffs-seek-restraining-order-against-police-for-harassment-coercion-and-threatening-conduct (last visited September 4, 2022). A preliminary-injunction/temporary-restraining-order request was filed as well. Doc. No. 8.

**FACTUAL MISREPRESENTATIONS**

Both the complaint and Plaintiffs' brief contain allegations that are blatantly false and devoid of context. Such misrepresentations implicate the legal maxim *falsus in uno*, *falsus in omnibus*. If Plaintiffs are willing to misrepresent things that are clearly depicted on video and contradicted by records, everything they claim should be viewed with skepticism. *See* THE DICTIONARY OF MODERN PROVERBS 139 ("[A] lie regarding one point can invalidate testimony on all related points[.]").

**Harris Brothers.** Robert Earl Harris is a convicted felon who served time for sexual assault. Chief Declaration, Ex. B. His younger brother Darius does not even reside in Lexington. Doc. No. 1 at ¶18. Plaintiffs' brief focuses on an incident that occurred on New Year's Eve in 2021. Doc. No. 1 at ¶18. Rather than provide this Court with video footage of the incident, still images are superimposed into the complaint to give the appearance that the Harris brothers were needlessly attacked by law enforcement. Doc. No. 1 at pp.9-11. Nothing could be further from the truth.

Officers were at the Harris residence because city ordinances prohibit shooting fireworks – even on New Year's Eve – in residential areas and on public streets. Fireworks Ordinance, Ex. D. When officers arrived to address the ordinance violation, the Harris brothers became irate. A video included as Exhibit E shows the brothers threatening the police, cursing them, and repeatedly

failing to follow lawful commands.  Darius eventually was tased by a black officer after he repeatedly ignored requests by both officers and his brother to go inside, moved swiftly toward officers in an aggressive manner, and ignored commands to back away from the officers.  *Id.*  The video shows Darius being told no less than 10 times to move away from the officers before he was tased.  *Id.*

Both brothers were charged with misdemeanors as well as the felony of retaliating against a public servant.  Harris Brothers Docs., Ex. F.  The felony is based on threats that can be viewed on the video footage, including a statement by Darius that he would "shoot up" the officers.  Harris Brothers New Years' Eve Body Cam Video, Ex. E. at 00:15-00:20.  Because the felony is awaiting presentment to a grand jury, the charges remain pending.  Chief Declaration, Ex. B. Documentation shows that the retaliation charges were made out in January as opposed to April as Plaintiffs' brief suggests.  *Compare* January 18, 2022 Warrant Affidavit, Ex. G *with* Doc. No. 8 at p.14.  This fact is omitted because it does not fit Plaintiffs "retaliation" narrative for the brothers supposedly attending an April 7 "Know Your Rights" meeting.  *See* Doc. No. 8 at p.14.

Plaintiffs' brief also references alleged "disparate enforcement of municipal laws" based on Robert's violation of Lexington's junk cars ordinance.  Doc. No. 8 at pp.14-15.  Tellingly, Robert does not say that he did not violate the law; he instead complains about white citizens not receiving tickets.  *Id.*  But without any detail about which white citizens Plaintiffs believe are in similar violation, the City cannot respond to the baseless claim.

**Peter Reeves.**  Plaintiffs' brief focuses on Reeves' March 6, 2022 arrest by the current police chief, Charles Henderson.  Doc. No. 8 at pp.15-16.  It occurred around 2:00 a.m. in the morning when Reeves went through a safety checkpoint.  Reeves Docs., Ex. H.  His vehicle had unlawful tint on it, he had no proof of insurance, and Chief Henderson could smell marijuana in

Reeves' vehicle. *Id*. A search revealed two pill bottles, neither of which were prescribed to Reeves. *Id*. One pill bottle had his uncle's name on it and contained 67 pills. *Id*. The other had no identification and was filled with 19 oxycontin pills. *Id*. Plaintiffs' brief untruthfully suggests that Reeves only possessed his uncle's pills (which itself was unlawful) and Tylenol. *See* Doc. No. 8 at p.15. Reeves was convicted of the two misdemeanors, but the felony narcotics charge was not pursued. *See* Reeves Docs., Ex. H.

**Malcom Stewart.** Malcom Stewart is a convicted felon who has served time for, among other things, burglary, selling cocaine, and driving under the influence. Chief Declaration, Ex. B. Plaintiffs' brief claims that Chief Henderson has harassed Stewart and his family, Doc. No. 8 at pp.17-19, claims that are blatantly false.

Chief Henderson does not deny making a "black suit" comment to Stewart, but this came after Stewart threatened to assault Chief Henderson while Stewart was loitering and drinking in the parking lot of a private business in September 2019. *See* Stewart Docs, Ex. I. (The incident did not occur on March 4, 2021 as Plaintiffs' briefing indicates.) Stewart was found guilty of failure to obey, loitering, and open container in relation to the incident. Chief Declaration, Ex. B.

Plaintiffs also reference a July 30, 2022 incident, Doc. No. 8 at p.18, but the incident actually occurred on June 30, 2022. Stewart was drunk in a stolen car that had a tag belonging to a different vehicle. *See* Stewart Docs, Ex. I. Plaintiffs' brief says Stewart was "peaceful" and was illegally seized and subjected to excessive force. Doc. No. 8 at p.18. But yet again video evidence proves otherwise. The video included as Exhibit J shows that Stewart was combative and consistently refused to comply with law enforcement commands. While sitting in the police vehicle, Stewart repeatedly uses phrases such as: "You white son of a bitch, as soon as I get these handcuffs off, I'm gonna beat your mother fucking ass." *Id*. at 8:54-10:50. The paperwork

included at Exhibit I shows that Stewart was in a stolen vehicle. *See also* Ex. J at 6:26-7:00 (switched tag), 7:30-8:23, 10:10-10:21 (stolen vehicle). Stewart was charged with simple assault, obstructing traffic, resisting arrest, possession of stolen property, driving under the influence, switched tag, and failure to comply. Chief Declaration, Ex. B. The charges remain pending. *Id.*

Plaintiffs also claim that, on April 9, 2022, Stewart was arrested in retaliation for his participation in the April 7, 2022 "Know Your Rights" meeting. Doc. No. 8 at p.17. According to Plaintiffs, Stewart was told he was arrested for "old fines." *Id.* But the documentation shows that Stewart was arrested for expired driver's license, disturbing the peace, and failure to comply when he arrived at the police station and began screaming at officers. Stewart Docs, Ex. I. He continued screaming at officers when asked to stop. *Id.* He paid the fines for these charges, thereby establishing guilt. *Id.*

**Eric Redmond.** Plaintiffs' brief paints a picture of Redmond simply trying to bail his sister out of jail in June 2022. Doc. No. 8 at pp.16-17. Not so. Redmond was among several people blocking Officer Jeremy Shiers' patrol car. Redmond Docs, Ex. K. When Shiers asked them to move, Redmond said: "This is fucking bullshit" and that he would not move. *Id.* Redmond was ordered several times to leave, but he refused and continued to shout profanity. *Id.* He was arrested and resisted attempts to be placed in handcuffs. *Id.* Redmond was charged with disorderly conduct/failure to comply and resisting arrest, and the charges remain pending. Chief Henderson Declaration, Ex. B; Redmond Docs, Ex. K (showing court date was continued to 9/22/2022).

**Other Allegations.** The complaint and brief also make misrepresentations unrelated to the five named plaintiffs. Although it would be impossible to rebut every allegation given the City's short response deadline and given Plaintiffs' failure to use names or offer specific details, the City

has gathered evidence that contradicts much of what Plaintiffs say.  Examples of other falsehoods

include the following:

- that board member Pitchford "was fired from his job at a white-owned funeral home and threatened by white citizens" after he voted to terminate Dobbins. Doc. No. 8 at p.4, n.9.  Attached is an affidavit from Pitchford stating that such allegations are categorically false and that Pitchford still works at the funeral home to this day.  Pitchford Affidavit, Ex. L.

- that Dobbins continues "to menace Black Lexington citizens" from the passenger seat of a patrol car with some unnamed Lexington officer.  Doc. No. 8 at p.5.  Plaintiffs tellingly uses the "based on information and belief" qualifier, for neither Chief Henderson nor Mayor McCrory is aware of Dobbins ever having done so following his termination.  Mayor Declaration, Ex. A; Chief Declaration, Ex. B.  Dobbins does not even live in Lexington.  Chief Declaration, Ex. B

- that Dobbins kicked an unnamed suspect in the head.  Doc. No. 8 at p.8.  This is believed to be a reference to Harrison Keys, a man who took officers on a dangerous high-speed chase before eventually being apprehended. A female officer named Ternicka Williams – long after the chase – accused Dobbins of kicking Keys, even though there is a video showing officers simply trying to apprehend the fleeing suspect.  *See* Ex. M.  On the video, Williams can be heard saying nothing is wrong with Keys and telling him, "Both of us could have been killed because of your bullshit."  *Id.*

- that the city attorney met with Plaintiffs' counsel but "just made excuses . . . that the civil rights attorneys found clearly pretextual[,]" Doc. No. 8 at p.9, and that the municipal judge, Attorney Marc Boutwell, "has harassed Black Lexington citizens[,]" unlawfully closed the courthouse, and treated Plaintiffs' counsel and other attorneys unfairly.  Doc. No. 8 at pp.10-11. These disparaging remarks aimed at respected members of the Bar are false and suggest that Plaintiffs' counsel has made herself a witness in this case.  *See* Miss. R. Prof. Conduct 3.7 (explaining that, except in limited circumstances, "[a] lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness").

- that the Mississippi Attorney General has refused to intervene in response to Plaintiffs' counsel's requests because the Barretts have "donated tens of thousands of dollars" to her campaign.  Doc. No. 8 at p.11.  It is not surprising that the Attorney General has not "intervened," since Plaintiffs' allegations are false and unsupported.  Candidate donations are public record, and they show that the Barretts have made campaign contributions to various candidates as the First Amendment permits them to do, although not the "tens of thousands of dollars" Plaintiffs' claim.

## LEGAL REASONS WHY THE INJUNCTION REQUEST MUST BE DENIED

Preliminary-injunctive relief "is an extraordinary and drastic remedy," meaning that courts require substantial evidentiary support. *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989). "Speculation[,]" including "broad and unsubstantiated allegations that [ ] police officers and other city officials have a vendetta[,]" do not suffice. *Robinson v. Home Depot USA Inc.*, 487 F. App'x 820, 826 (5th Cir. 2012). Because Plaintiffs' request is built on nothing more than factual misrepresentations and unsubstantiated assertions, it must be rejected outright. But there are many legal doctrines Plaintiffs cannot overcome as well, including a lack of jurisdiction, improperly requested relief, and failure to satisfy each of the stringent requirements for a preliminary injunction.

### I.      There is no jurisdiction to grant a preliminary injunction.

Jurisdiction is lacking for several reasons. Two relate to Plaintiffs' pending charges, and the other relates to standing. Each is addressed in turn.

***Heck* Doctrine.** Four of the five Plaintiffs – the Harris brothers, Stewart, and Redmond – have pending criminal charges that arise out of allegations made in this lawsuit. If they are convicted, some or all of their claims will be barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). Plaintiff Reeves paid fines related to his charges, thereby admitting guilt. Reeves Docs, Ex. H. Under *Heck*, individuals cannot collaterally attack criminal convictions via a civil lawsuit. *Id.* at 487. Such attacks are impermissible regardless of whether a plaintiff seeks monetary or injunctive relief. *See VanBuren v. Walker*, 841 F. App'x 715, 716 (5th Cir. 2021) ("*Heck* prevents him from raising any constitutional claim or seeking any injunctive relief that would result in invalidating, or implying the invalidity of, a conviction or sentence that has not otherwise been reversed, expunged, or called into question.").

When, as here, criminal charges have not been resolved, a case may not move forward. Indeed, the Supreme Court has made clear that it is "in accord with common practice [for trial courts] to stay [a] civil action until the criminal case or the likelihood of a criminal case [ha]s ended." *Wallace v. Kato*, 549 U.S. 384, 393 (2007).  So too has the Fifth Circuit, explaining "that, following *Heck v. Humphry*, 512 U.S. 477 (1994), district courts should stay § 1983 cases that may implicate the validity of the pending criminal proceedings until those underlying proceedings have run their course." *Gates v. Strain*, 885 F.3d 874, 883 (5th Cir.  2018) (citing *Mackey v. Dickson*, 47 F.3d 744, 746 (5th Cir. 1995)) ("The court may—indeed should—stay proceedings in the section 1983 case until the pending criminal case has run its course, as until that time it may be difficult to determine the relation, if any, between the two.")).  Mississippi district courts apply this "common practice" without fail, usually directing the Clerk of Court "to mark th[e] action closed for statistical purposes during the pendency of the stay."  *See, e.g.*, *Willis v. City of Hattiesburg*, 2015 WL 13651763, *6 (S.D. Miss. 2015).

***Younger* Abstention.**  Relatedly, abstention under *Younger v. Harris*, 401 U.S. 37 (1971) is appropriate where a federal action would interfere with state criminal proceedings.  *See Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69, 73 (2013).  The doctrine applies regardless of whether there is a set court date for the pending charges. *See O'Shea v. Littleton*, 414 U.S. 488, 500-01 (1974).  Undergirding the doctrine are "principles of equity, comity and federalism[.]" *Duke v. State of Texas*, 477 F.2d 244, 248 (5th Cir. 1973).

In *O'Shea*, the Supreme Court rejected an injunction request as intrusive and unworkable. So too here.  Impermissible "[i]nterference is established 'whenever the requested relief would interfere with the state court's ability to conduct proceedings, regardless of whether the relief targets the conduct of a proceeding directly.'"  *Bice v. La. Pub. Def. Bd.*, 677 F.3d 712, 717 (5th

PD.39737730.1

Cir. 2012) (quoted case omitted).  Stated differently, it is does not matter whether the target of an injunction is police conduct or judicial action.

Consider questions that would arise if Plaintiffs had their way.  If the City moves forward with the pending charges, will it be subject to contempt proceedings for "harassing" Plaintiffs? What if a grand jury indicts and a capias is issued for their arrest?  Or perhaps one of the plaintiffs violates the speed limit and is pulled over or has an invalid license when traveling through a checkpoint.  Are these actions subject to contempt?  In each scenario, state proceedings would have to cease while this Court considered whether an injunction had been violated.

Plaintiffs' requested injunction is simply unworkable and "would require for its enforcement the continuous supervision by the federal court over the conduct of the [defendants] in the course of future criminal trial proceedings involving any of the members of the respondents' broadly defined class." *See O'Shea,* 414 U.S. at 501.  "[S]uch a major continuing intrusion of the equitable power of the federal courts into the daily conduct of state criminal proceedings is in sharp conflict with the principles of equitable restraint which [the Supreme Court] has recognized in [prior] decisions[.]" *Id.* That is why "the normal thing to do when federal courts are asked to enjoin pending proceedings in state courts is not to issue such injunctions." *Duke*, 477 F.2d at 248 (quoted case omitted).

**Standing.**  All cases require standing.  *See DaimlerChrysler Corp., v. Cuno*, 547 U.S. 332, 342 (2006).  And plaintiffs are required to establish standing with respect to every claim brought as well as the relief requested.  *Id.*; *see also El Paso Cty., Tex. v. Trump*, 982 F.3d 332, 342 (5th Cir. 2020).[2]  In this case, Plaintiffs lack standing because they are not class representatives and because their requested relief is speculative.

---

[2] "To seek injunctive relief, a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be

For starters, although this case has been brought only in the names of five individuals, Plaintiffs seek relief on behalf of all black Lexington citizens.  They allege unconstitutional conduct by (mostly) unnamed police officers and seek an order compelling the police department to follow the Constitution.  In particular, Plaintiffs ask that, among other things, the police department be stopped from:

- threatening, coercing, harassing, assaulting, or interfering with *Black Lexington citizens'* constitutional right to travel freely, their First Amendment rights to free speech and association, their Fourth Amendment rights to be free of unreasonable search and seizure, false arrests, and excessive force, their Fourth Amendment right to due process, and their right to equal protection under the Fourteenth Amendment;

- interfering with *Black Lexington citizens'* peaceful, nonviolent, lawful travel on the public roads and highways in Lexington, Holmes County, Mississippi;

- failing to provide adequate police protection for the Plaintiffs *and other Black Lexington citizens* in the exercise of their aforementioned constitutional rights.

Doc. No. 1 at pp.36-37 (emphasis added).

The law is clear that Plaintiffs do not have standing to obtain the relief they want, particularly an injunction applicable to people that are not parties to this lawsuit.  *See In re Abbott*, 954 F.3d 772, 786 n.19 (5th Cir. 2020)  ("[W]e note that the district court purported to enjoin GA-09 as to all abortion providers in Texas.  But Respondents are only a subset of Texas abortion providers and did not sue as class representatives.  The district court lacked authority to enjoin enforcement of GA-09 as to anyone other than the named plaintiffs."), *judgment vacated as moot by Planned Parenthood Ctr. for Choice v. Abbott*, 141 S. Ct. 1261 (2021) (mem.); *Campbell v. Miller*, 373 F.3d 834, 836 (7th Cir. 2004) (Easterbrook, J.) ("Campbell has sought to represent all persons arrested for misdemeanors, but the district court has not certified that class and may never do so. Thus Campbell cannot rely on the prospect that other arrested persons may be subjected to

---

fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the decision."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).

PD.39737730.1

body-cavity searches.").  To be sure, the Supreme Court has long said that "neither declaratory nor injunctive relief can directly interfere with enforcement of contested statutes or ordinances <u>except with respect to the particular federal plaintiffs</u>, and the State is free to prosecute others who may violate the statute." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975) (emphasis added).

The only authority Plaintiffs cite in favor of the sweeping injunction they propose is *Williams v. Wallace*, 240 F. Supp. 100 (M.D. Ala. 1965). But the plaintiffs in *Williams* were class representatives. *Id.*  Not so with Plaintiffs here.

What's more is that, even with respect to Plaintiffs themselves, the referenced relief is impermissibly speculative. They rest on their claim that all black Lexington citizens are likely to face an encounter with Lexington police, ignoring that they must show that *they* specifically are likely to be seized without reasonable suspicion, be retaliated against in violation of the First Amendment, or be discriminated against because of race. *See Campbell*, 373 F.3d at 836 ("Unless the same events are likely to happen again to him there is no controversy between him and the City about the City's future handling of other arrests."). Besides their footnoted fear of retaliation based on this lawsuit, they have not even attempted to make the required showing. *See generally* Doc. No. 8.

*Rizzo v. Goode*, 423 U.S. 362 (1976) is instructive on this point.  In *Rizzo*, the plaintiffs alleged a pervasive pattern of illegal and unconstitutional mistreatment by police officers against minority citizens.  423 U.S. at 366-67.  Although the district court entered an injunction requiring City officials to submit to a comprehensive program for improving the handling of citizen complaints alleging police misconduct, the Supreme Court reversed under the "real and immediate" injury requirement.  *Id*. at 365, 372.  The speculative assertion that "a small, unnamed

PD.39737730.1

minority of policemen" might commit constitutional violations against the plaintiffs was held to be too attenuated. *Id.* at 372-73.

This holding was echoed in *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). There, the Supreme Court held that Lyons lacked standing because, while past conduct by police officers afforded standing to seek money damages, past occurrences were insufficient "to establish a real and immediate threat that he would again be" subjected to unconstitutional conduct. *Id.* at 106.

The threat of future harm is even more speculative here. The crux of Plaintiffs' complaint is that all black citizens are being unconstitutionally targeted because of their race and because of their First Amendment activity. But all of the incidents involving Plaintiffs occurred while former-Chief Dobbins was still the police chief. Now, not only is the new police chief black, but the entire police force is made up of black officers, and a majority of the governing board for the City is black. It is unthinkable under these circumstances that the City would condone a racially-motivated policy. *See, e.g.*, *McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 460-61 (5th Cir. 2019) (explaining that "discrimination [is] less likely" when decisionmakers and plaintiffs are members of the same protected class). And it is equally speculative to assume that Plaintiffs may be arrested due to First Amendment protected activities or speech, when the probable cause undergirding each past arrest was so strong. *See Russell v. Altom*, 546 F. App'x 432, 436 (5th Cir. 2013) ("Both [plaintiff's] First Amendment claim and his Fourth Amendment claim require an absence of probable cause to support the arrest.").

Additionally, in *Lyons*, the Court found it important that five months passed between the initial encounter with police and the filing of the complaint, yet no other "unfortunate encounters" occurred. *Lyons*, 461 U.S. at 109. The same is true here. In the year since Dobbins was named Chief, between the five Plaintiffs, only seven arrests occurred, and only one was at a checkpoint.

Additionally, the last encounter for Plaintiff Reeves occurred in March, Plaintiffs Darius and Robert Harris in April, and Plaintiffs Redmond and Stewart in June.  Thus, for three of the five Plaintiffs, no encounters have occurred in more than four months, meaning it is conjectural to assume that Plaintiffs, if they simply obey the law, will be subject to unconstitutional conduct in the future.

Like in *Lyons*, Plaintiffs are "no more entitled to an injunction than any other citizen of [Lexington]; and a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officer are unconstitutional."  *Id.* at 111.  Standing is lacking.

## II.     The type of injunction sought is impermissible.

Even if there was jurisdiction, the law would not permit what Plaintiffs seek.  They have neither satisfied Rule 65's specificity requirement nor overcome an obvious federalism obstacle. Each is addressed in turn.

**Specificity.**  Under Rule 65(d)(1), the terms of an injunction must be "specific."  This command "is a reflection of the seriousness of the consequences which may flow from the violation of an injunctive order."  *Payne v. Travenol Labs., Inc.*, 565 F.2d 895, 897 (5th Cir. 1978). Here, Plaintiffs' briefing merely requests injunctive relief that would require Lexington police officers to do their job and not commit unconstitutional acts.  *See* Doc. No. 8 at p.32 ("This injunction is merely requiring Defendants to cease unconstitutional practices. . . . At most, Defendants will be required to comply with the Constitution—something that Defendants are tasked with doing anyway.").  This is the prototypical "obey-the-law" injunction that is impermissibly vague and unenforceable.  *See, e.g.*, *Meyer v. Brown & Root Const. Co.*, 661 F.2d

369, 373 (5th Cir. 1981) ("A general injunction which in essence orders a defendant to obey the law is not permitted.").

Case law is filled with examples showing that such relief is not allowed.  In *Rhiner v. Jones*, 2018 WL 9391726 (S.D. Tex. 2018), a district court denied an injunction requesting that officers not engage in First Amendment retaliation as an unenforceable obey-the-law injunction.  *Id.* at *2 (collecting cases).  Similarly, in *Randolph v. East Baton Rouge Parish School Board*, 2016 WL 3579224 (M.D. La. 2016), the district court held that a "request to enjoin Defendants from bullying, harassing, intimidating, or depriving administrators of due process" was vague and unenforceable.  *Id.* at *3.  Likewise, in *Walker v. City of Calhoun, Ga.*, 682 F. App'x 721, 724 (11th Cir. 2017), the Eleventh Circuit held that an injunction "requiring the City to 'comply with the Constitution[,]' [was] the archetypical and unenforceable 'obey the law' injunction[.]" Countless cases make the same point.  *E.g., Hutto v. Finney*, 437 U.S. 678, 714 (1978) (Rehnquist, J. dissenting) (No "federal court is entrusted with [the role of managing State affairs] under the Constitution" and cannot enter injunctions where the only ground is a "prophylactic one of assuring that no unconstitutional conduct will occur in the future."); *Payne*, 565 F.2d at 898 ("The word 'discriminating' ... is too general.... Such 'obey the law' injunctions cannot be sustained."); *Perez v. Ohio Bell Telephone Co.*, 655 F. App'x 404, 411 (6th Cir. 2016) (collecting cases from Second, Third, Fourth, Fifth, Eighth, Tenth, and Eleventh Circuits which prohibit "obey the law" injunctions and Seventh and Ninth Circuits which have expressed disfavor with such injunctions).

Plaintiffs' request that Defendants be enjoined from "threatening, coercing, harassing, assaulting, or interfering" with various constitutional rights is on par with this line of cases.  Doc. No. 1 at pp.36-37.  It should, consequently, suffer the same fate.

**Mandatory Nature of Relief.**   To the extent that Plaintiffs' complaint provides more specificity than their briefing, the complaint impermissibly requests an alteration of the status quo and performance of affirmative acts.   Specifically, Plaintiffs request that this Court require the City:  to request police support from the State of Mississippi; to establish an independent civilian complaint review board; to empower the new civilian complaint board to investigate LPD policies and practices to identify systemic problems, subpoena LPD documents and testimony for investigations, and impose binding disciplinary decisions upon findings that an LPD officer has violated civil rights; and to institute and implement improved policies and programs with respect to training, discipline, and promotion.  Doc. No. 1 at pp.37-38.  This kind of affirmative relief goes beyond a federal court's equitable powers and raises serious federalism concerns.

In essence, Plaintiffs seek a "structural injunction."  Structural injunctions are defined as "injunction[s] seeking to effect the reform of a social institution."  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 296 n.6 (D.C. Cir. 2006) (quoting Owen M. Fiss, *The Civil Rights Injunction* 9 (1978)).[3]  Unsurprisingly, "[s]uch expansive use of equitable remedies has long been recognized as a threat to federalism."  *In re Gee*, 941 F.3d 153, 167 (5th Cir. 2019).

At the Founding, Anti-Federalists opposed the Constitution, in part, because of fears that it might be read to grant broad equitable powers to federal courts.  *Missouri v. Jenkins*, 515 U.S. 70, 126 (1995) (Thomas, J. concurring).  That is why, in "defending the proposed Constitution, 'Hamilton sought to narrow the expansive Anti-Federalist reading of inherent judicial equity

---

[3] *Valentine v. Collier*, 993 F.3rd 270, 292 (5th Cir. 2021) (Oldham, J. concurring) ("Thus the purpose of the structural injunction[] is to alter broad social conditions by reforming the internal structural relationships of government agencies or public institutions. Instrumentally, it operates through the forward-looking, mandatory injunction but assumes a relatively intrusive form, a more or less detailed order whose prescriptions displace significant areas of defendants' discretion. . . . It usually finds its justification in the more open-ended constitutional provisions, such as the equal protection or due process clauses.") (quoted citation omitted).

power' and 'described Article III equity as a jurisdiction over certain types of cases rather than as a broad remedial power.'" *Gee*, 941 F.3d at 167 (quoting *Jenkins*, 515 U.S. at 130).

Such concerns remain, for "[f]ederalism is a clear restraint on the use of equity power because a structural reform decree eviscerates a State's discretionary authority over its own program and budgets." *Id.* (cleaned up).  "[S]weeping requests for 'intrusive and unworkable' injunctions are nonjusticiable because they threaten 'the special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.'" *Id.* (quoting *O'Shea v. Littleton*, 414 U.S. 488, 500 (1974)).

"Federal judges cannot make the fundamentally political decisions as to which priorities are to receive funds and staff, which educational goals are to be sought, and which values are to be taught. When federal judges undertake such local, day-to-day tasks, they detract from the independence and dignity of the federal courts and intrude into areas in which they have little expertise." *Jenkins*, 515 U.S. at 133.  It is the several states, not the federal government, who must maintain general police powers.  Police officers enforce state criminal statutes, which are then tried in state courts by state prosecutors.  *Valentine*, 993 F.3d at 293.

To grant the type of injunctive relief requested by Plaintiffs would be "to demand permanent judicial intervention in the conduct of governmental operations to a degree inconsistent with sound principles of federalism and the separation of powers." *Garcetti v. Ceballos*, 547 U.S. 410, 423 (2006).  Plaintiffs seek to have this Court impose itself in local affairs and budgetary considerations regarding training and staffing by requiring the City to implement new training, discipline, and promotion practices and to create a citizen review board meant to usurp the role of

the Board of Aldermen and courts.  But these are purely state and local issues, governed largely by state statute.[4]  Courts consistently reject interference into these types of matters.

Take the Supreme Court's decision *Rizzo*, for example.  The Court first rejected the notion that there was a "constitutional 'duty' on the part of [the City officials] (and a corresponding 'right' of the citizens of Philadelphia) to 'eliminate' future police misconduct" and that the district court could "act in [the City officials'] stead and take whatever preventative measures necessary, within its discretion, to secure the 'right[.]'"  423 U.S. at 376.  Citing federalism, the Court further rejected that the citizens had a "right to mandatory equitable relief in some form when those in supervisory positions do not institute steps to reduce the incidence of unconstitutional police misconduct."  *Id.* at 378.  The Court held that the district court erred "[w]hen it injected itself by injunctive decree into the internal disciplinary affairs" of the police department.  *Id.* at 380.

Plaintiffs' request for impermissible and unworkable mandatory relief that would undercut the City's ability to manage its own affairs in accordance with state statutes should likewise be denied.  No legal authority supports such sweeping relief, and founding principles reject it.

### III.    The settled requirements for a preliminary injunction are missing.

Even if Plaintiffs could overcome the already-addressed non-starters, requests for preliminary injunctions are governed by a "stringent" substantive standard.  *See Nichols v. Alcatel*

---

[4] Mississippi Code § 45-6-11, for example, governs law enforcement certification while § 45-6-19 governs law enforcement continuing education requirements.  The Mississippi Board on Law Enforcement Officer Standards and Training pays at least 50% of training costs while the employing municipality covers the rest.  Miss. Code § 11-6-13.  Similarly, by statute, the Board of Aldermen has the sole authority to make employment decisions, including hiring, firing, promotions, and most disciplinary decisions. Miss. Code § 21-3-5.  Finally, municipalities do not have subpoena power, and therefore cannot grant subpoena power to a citizen review board.  Plaintiffs are asking this Court to force a municipality to do something that it has no authority to do under state law.  And the grant of subpoena power to a citizen complaint board would implicate separation of powers, Fifth Amendment, and privilege issues.  *E.g., Miss. State Bar v. Attorney-Respondent in Disciplinary Proceedings*, 367 So. 2d 179, 183 (Miss. 1979); *Miss. Ethics Comm'n v. Committee on Prof. Resp. of the Miss. Bar*, 672 So. 2d 1222, 1244 (Miss. 1996); *see also* Miss. Code §§ 25-1-100 & 25-61-1 *et seq.* (exempting from disclosure certain law enforcement and personnel records).

*USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008).  Under this stringent standard, "[i]njunctive relief, particularly in the preliminary stages of litigation, requires an <u>unequivocal showing</u> of the need for relief to issue." *See, e.g.*, *RW Dev., L.L.C. v. Cuningham Grp. Architecture, Inc.*, 2012 WL 3258782, *2 (S.D. Miss. 2012) (emphasis added; citation omitted).  Put simply, "[t]he decision to grant a preliminary injunction is to be treated as the exception rather than the rule." *Id.* (quoting Fifth Circuit precedent).

Plaintiffs cannot come close to satisfying the stringent standard.  For a preliminary injunction to issue, they "must show: (1) a substantial likelihood of success on the merits, (2) a substantial threat that [he] will suffer irreparable harm if the injunction is not granted, (3) that the threatened injury outweighs any damage that the injunction might cause the defendant[s], and (4) that the injunction will not disserve the public interest." *See Nichols*, 532 F.3d at 372.  Plaintiffs have not "clearly carried the burden of persuasion on all four requirements." *See Big Tyme Invs., L.L.C. v. Edwards*, 985 F.3d 456, 464 (5th Cir. 2021).

**Substantial Likelihood of Success.**  Plaintiffs' briefing on this requirement focuses only on three claims: Fourth Amendment search and seizure; First Amendment Retaliation; and Fourteenth Amendment Equal Protection.  Doc. No. 8 at pp.19-26.  None of these claims have a likelihood of success.  Lack of a constitutional violation, qualified immunity, and *Monell* are obstacles that Plaintiffs will never overcome.

*The Constitution.*  The starting point is that Plaintiffs' alleged Fourth and First Amendment violations may be screened in tandem.  That is so because, as a general matter, the allegations under both are defeated upon a finding of probable cause.  *See, e.g.*, *Johnson v. Turner*, 2022 WL 3356341, *7 (E.D. La. 2021) (Like with a Fourth Amendment claim, "[t]he Fifth Circuit has held that to prevail on a First Amendment retaliation claim, a plaintiff must plead and prove the absence

PD.39737730.1

of probable cause.").  Although Plaintiffs spill so much ink complaining about racially-motivated conduct, an "arresting officer's subjective reasons for taking a suspect into custody are immaterial."  *See, e.g.*, *Sinegal v. City of El Paso*, 2020 WL 13442013, *6 (W.D. Tex. 2020).  "The test for determining whether probable cause exists is objective[,"] not subjective.  *Id*.

Objectively, Plaintiffs' theory fails.  Each plaintiff either has been convicted or has criminal charges pending, which means that, under *Heck*, a civil finding of probable cause would be impossible.  *See, e.g.*, *Poole v. Russell*, 2016 WL 6082041, *4 (W.D. La. 2016) (holding that *Heck* barred First Amendment claim); *Handshaw v. Hilliard*,  2015 WL 5177623, *3-4 (S.D. Miss. 2015) (holding that *Heck* barred Fourth Amendment claim).  Plus, even without criminal convictions, the "low bar" of probable cause is easily met on the evidence before this Court.  *See District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018).  There is (1) a video showing the outrageous behavior of the Harris brothers, (2) a video of Stewart in a stolen car, (3) a police report and tacit admission that Reeves possessed illegal narcotics, and (4) a police report showing that Redmond cursed and failed to obey law enforcement commands.

To the extent Plaintiffs focus on roadblocks, it is dispositive that they do not cite a single piece of evidence in their one-and-a-half-page discussion of them.  *See* Doc. No. 8 at pp.20-21. The Fifth Circuit recently reiterated that checkpoints are constitutional for a variety of purposes, including checking driver's licenses, checking seatbelts, determining the existence of outstanding warrants, inspecting registration and proof of insurance, etc.  *See United States v. Burgos-Coronado*, 970 F.3d 613, 618-19 (5th Cir. 2020).  Reeves, who is the only plaintiff in this case subjected to an arrest at a checkpoint, was "asked for his license and insurance" as he came to the checkpoint.  *See* Reeves Docs, Ex. H.  And the map Plaintiffs place on page 14 of the complaint

does not help them, for it shows that the roadblocks were located on the major highways running through the town and not in "black neighborhoods."

No better is Plaintiffs' equal-protection theory, which is an attempt to sidestep the objective nature of the probable-cause inquiry.  In theory, equal-protection law enforcement claims are possible, but "the standard for proving a selective-enforcement claim is a demanding one."  *See Barwick v. Behnke*, 548 F. App'x 516, 519 (10th Cir. 2013) (cleaned up).  A plaintiff must prove both discriminatory effect and discriminatory purpose, standards that typically require "similarly situated" comparators.  *See Saunders v. Thies*, 38 F.4th 701, 714 (8th Cir. 2022).

The uncited allegations in Plaintiffs' brief do not satisfy the "demanding" similarly-situated test.  Plaintiffs have not pointed to any white citizen, for example, who threatened officers like the Harris brothers, who possessed narcotics like Reeves, who was drunk in a stolen car like Stewart, or who cursed and failed to comply like Redmond.  Without such evidence, a selective-enforcement claim goes nowhere.  *Id.* (finding that the similarly-situated requirement was not satisfied where "each of the instances differed in their circumstances, the questioning of the vehicle's occupants, and the investigation of different violations or offenses").

*Qualified Immunity*.  Since Plaintiffs are unlikely to demonstrate a violation of the Constitution, qualified immunity is unnecessary.  *See Hill v. Carroll Cty., Miss.*, 587 F.3d 230, 238 (5th Cir. 2009).  But it provides an additional barrier in any event.  *See Bonnell v. Lorenzo*, 241 F.3d 800, 824 (6th Cir. 2001) ("Defendants may be entitled to qualified immunity, and this could provide yet another basis for concluding that Plaintiff has not shown a substantial likelihood of success on the merits of his claim.").

Under the doctrine, law enforcement officers are protected from all but incompetency and knowing violations of the law.  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  Indeed, unless every

- 22 -

reasonable officer on the street would know "in the blink of an eye" that his conduct is unconstitutional because of the authoritative precedent, then qualified immunity is a shield. *Morrow v. Meachum*, 917 F.3d 870, 876 (5th Cir. 2019). Plaintiffs' baseless claims cannot overcome the stringent qualified-immunity defense.

*Monell*.   Plaintiffs also cannot succeed against the City because, again, they cannot demonstrate a constitutional violation.   Without demonstrating underlying unconstitutional conduct, there can be no municipal liability under Section 1983. *See Whitley v. Hanna*, 726 F.3d 631, 639 n.3 (5th Cir. 2013).

But even unconstitutional conduct is never enough.   "It is well established that a city is not liable under § 1983 on the theory of *respondeat superior*."  *Valle v. City of Houston*, 613 F.3d 536, 541 (5th Cir. 2010) (cited Supreme Court case omitted).   There instead must be "something more," i.e. proof that a municipal policy or custom was the "moving force" that caused the alleged constitutional violation.   *See Snyder v. Trepagnier*, 142 F.3d 791, 796 (5th Cir. 1998) ("[W]e have demanded a high standard of proof before imposing *Monell* liability on a municipality.").

Plaintiffs readily admit there are no unconstitutional written policies.   *See* Doc. No. 8 at p.26 ("Defendants' unconstitutional activity is a departure from their written procedures and past conduct.").   So, to get around the no-vicarious-liability rule, Plaintiffs seek to establish an unlawful custom or practice and a failure-to-train.   Both fail.

Plaintiffs' unofficial custom theory fails because they will be unable to satisfy the numerosity and specificity requirements for such a theory.   *E.g.*, *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (explaining that an unofficial custom must be "so persistent and widespread as to practically have the force of law"); *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 850-51 (5th Cir. 2009). (explaining that, under the "demanding" unofficial custom theory, a plaintiff must

identify "sufficiently numerous prior incidents" and those prior incidents must be both similar and specific to the alleged violation in question).  Plaintiffs' failure-to-train theory will fail due to lack of a particular inadequate policy and due to no policymaker deliberate indifference causing the alleged injury.  *E.g.*, *Ratliff v. Aransas Cty., Tex.*, 948 F.3d 281, 285 (5th Cir. 2020); *Carnaby v. City of Houston*, 636 F.3d 183, 189 (5th Cir. 2011).

**Irreparable Harm.**  The irreparable harm inquiry closely follows the standing inquiry for, in order to obtain injunctive relief, Plaintiffs must establish "the likelihood of substantial and immediate irreparable injury[.]"  *Lyons*, 461 U.S. at 103 (quoting *O'Shea*, 414 U.S. at 502). Plaintiffs' asserted "irreparable harm" includes: the alleged potential violation of constitutional rights; the possibility that unspecified people arrested will have to pay to defend "baseless charges that flow from Defendants' roadblocks[;]" that some unknown people may have to pay medical bills after being beaten by unnamed police officers; that some unnamed people are allegedly afraid to leave their homes during certain times which impacts their jobs and families; and the fact that, according to Plaintiffs, Lexington is on the brink of a race riot.  None of these harms have been shown to be ongoing so as to constitute an immediate and irreparable harm, and most are based on mere speculation or are allegations made without proof. *E.g.*, *Janvey v. Alguire*, 647 F.3d 585, 601 (5th Cir. 2011) ("The party seeking a preliminary  injunction must also show that the threatened harm is more than mere speculation."); *Friends of Lydia Ann Channel v. U.S. Army Corps of Eng'rs*, 701 F. App'x 352, 357 (5th Cir. 2017) ("Speculation built upon further speculation does not amount to a 'reasonably certain threat of imminent harm.'") (citations omitted)).

What's more is that, if their fears come true, they have an adequate remedy at law: a suit for money damages. "Damages are a normal, and adequate, response to a [constitutional injury], which as a constitutional tort often is analogized to (other) personal-injury litigation." *Campbell*,

373 F.3d at 835. An adequate remedy at law is generally a bar to injunctive relief. *E.g., Miller v. Miss. Resources, LLC*, 2017 WL 2772097 (S.D. Miss. 2017).[5]

**Balancing of Equities**. The balancing of equities and the public interests weigh heavily against the proposed injunction. Without any evidence of an official policy and an admission that no such express policy exists, Plaintiffs seek to enjoin a wide range of police conduct that is based on case by case facts. "Even assuming that [the] requested injunction is practicable, the imposition of such an injunction would dramatically disrupt—rather than preserve—the status quo by hampering defendants' ability to respond to and investigate complaints [and criminal activity], resulting in tremendous hardship to defendants and, in all likelihood, endangering civilians." *Gale v. O'Donohue*, 751 F. App'x 876, 885 (6th Cir. 2018). As Judge Easterbrook explained, "[e]rroneous grants of injunctive relief that hamper enforcement of the criminal law have the potential to cause havoc, while erroneous awards (or denials) of damages to a single person have more limited ability to injure the general public." *Campbell*, 373 F.3d at 835-36.

## <u>CONCLUSION</u>

There are ultimately many reasons why Plaintiffs' motion must be denied. Plaintiffs factual arguments are full of false allegations and speculation, and their legal arguments are meritless. No "extraordinary" relief is appropriate.

Dated: September 7, 2022.

---

[5] And the type of relief requested by Plaintiffs reinforces the non-urgent nature of Plaintiffs' complaints. Plaintiffs ask this Court to require the City to request law enforcement assistance from the Governor—a request which the Governor is under no obligation to grant. And which, even if granted, could only last 90 days by statute. Miss. Code § 45-3-21(c). It is unclear what Plaintiffs hope to gain from such discretionary relief.

PD.39737730.1

Respectfully submitted,

PHELPS DUNBAR LLP

BY:   /s/ G. Todd Butler
       W. Thomas Siler, Jr., MB #6791
       G. Todd Butler, MB #102907
       Mallory K. Bland, MB #105665
       4270 I-55 North
       Jackson, Mississippi 39211-6391
       Post Office Box 16114
       Jackson, Mississippi  39236-6114
       Telephone: 601-352-2300
       Telecopier: 601-360-9777
       Email:  silert@phelps.com
               butlert@phelps.com
               mallory.bland@phelps.com

**ATTORNEYS FOR THE CITY OF LEXINGTON AND CHIEF CHARLES HENDERSON**

PD.39737730.1

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on September 7, 2022, I had this RESPONSE electronically filed with the

Clerk of the Court, using the CM/ECF system, which sent notification of such filing to all counsel

of record.

 *s/ G. Todd Butler*
G. Todd Butler
