

Employee Policy Manual


City of Lexington Police Department

Lexington, Mississippi


Revised and Approved

February 2, 2021

## INTRODUCTION

It is the goal of the Police Department of the City of Lexington, Mississippi to provide the community with police service which will engender confidence and peace of mind among the citizens. The rules set forth in this manual are intended to help achieve that goal and to make the provision of police service safe for both members of the police force and the community. These rules merely indicate the minimum level of acceptable conduct for police force members. Compliance with these rules is expected as a condition of employment, and failure to abide by these rules may lead to disciplinary action.

## LAW ENFORCEMENT CODE OF ETHICS

As a law enforcement officer, my fundamental duty is to serve mankind; to safe-guard lives and property; against oppression or intimidation; the peaceful against violence or disorder, and to respect the constitutional rights of all men to liberty, equality, and justice.

I will keep my private life unsullied as an example to all; maintain courageous calm in the face of danger, scorn or ridicule; develop self-restraint; and be constantly mindful of the welfare of others. Honest in thought and deed in both my personal and official life, I will be exemplary in obeying the laws of the land and regulations of my department. Whatever I see or hear of a confidential nature or that is confided to me in my official capacity will be kept ever secret unless revelation is necessary in the performance of duty.

I will never act officiously or permit personal feelings, prejudices, animosities, or friendships to influence my decisions. With no compromise for crime and with relentless prosecution of criminals, I will enforce the law courteously and appropriately without fear or favor, malice or ill will, never employing unnecessary force or violence and never accepting gratuities.

I recognize the badge of my office as a symbol of public faith, and I accept it as public trust to be held as long as I am true to the ethics of police service. I will constantly strive to achieve these objectives and ideals, dedicating myself before God to my chosen profession, law enforcement.

_____

Officer's Name

Note: This code has been officially adopted by the International Association of Chiefs of Police and many law enforcement agencies.

# RULES OF CONDUCT

The following Rules of Conduct apply to all members of the police force, regardless of their rank, position, or responsibilities. Each member shall make every effort to abide by these rules and to assist other members to do so as well. References to "he" or "his" are for convenience only, and the Rules shall apply equally to both male and female members.

1. A member is charged with the duty to conduct himself at all times in accordance with the Law Enforcement Code of Ethics, which provides the guidelines for personal and official conduct. A member will be held responsible for any act or omission specifically required or prohibited in these and other applicable rules, regulations, directives, and procedures of the department.

2. A member shall promptly obey all lawful and proper orders and instructions issued by a superior officer or a recognized higher authority, however transmitted or received. Lawful and proper orders and instructions are those which conform to established law, ordinances of the City, and policies of the Police Department.

3. A member shall obey all municipal ordinances and all state and federal laws, and no command or supervisory member shall issue orders contrary to such laws which will obviously result in illegal action by a subordinate, except where necessary to affect the saving of human life.

4. A member of the Department will not allow his decisions or actions to be affected by prejudice of race, color, sex, religion, or political belief. Members shall not refer to any person in a derogatory manner because of his race, color, sex, religion, or political belief.

5. A member in contact with the public shall conduct himself with dignity, courtesy, and efficiency. A member of the Department shall not use uncivil, harsh, profane, or vulgar language when dealing with a member of the public.

6. A member shall be civil and respectful to officers of superior rank, whether of this department or another. A member shall be dignified, courteous, and cooperative with other members of the Police Department and with officials and members of other governmental and law enforcement organizations.

7. A member shall be honest and truthful at all times. A polite declination to comment shall be used in those cases where a member should not divulge confidential or critical information.

8. A member shall not display cowardice in the line of duty or in any situation in which a member of the public might be subject to physical danger.

9. A member shall not knowingly associate or have any dealing with criminals, racketeers, gamblers, or persons engaged in unlawful activities; a member shall not frequent or operate places of questionable character, either while on or off duty, except when necessary in the official performance of duty.

10. A member shall not engage in any illegal, immoral, or indecent conduct, or in any activity which would tend to reflect discredit upon the Police Department.

11. A member shall not accept awards, gratuities, or any article of value as payment for favors or services rendered in connection with his official duties unless approved by the Chief of Police.

12. A member shall not accept or solicit, or knowingly cause to be procured, a testimonial of any kind relative to his performance of police duties, except with the permission of the Chief of Police.

13. A member shall not be absent from duty without properly authorized leave.

14. A member shall be punctual in reporting for duty or performing any official act.

15. A member shall be alert throughout his tour of duty and shall prepare himself by having adequate rest and sleep prior to reporting for duty. A member shall not sleep while on duty without specific and proper authorization.

16. A member shall not use his off-duty time in any manner that renders him unfit for the proper and efficient performance of his duties.

17. A member shall treat as confidential the official business of the Department. He shall not impart it to anyone except for those for whom it is intended or under due process of law.

18. A member shall not write or furnish material concerning police matters for publication or for broadcast without approval of the Chief of Police.

19. A member off duty is forbidden to use intoxicants to a degree or in such a manner as to discredit the Police Department, or to cause him to be unfit for duty under emergency circumstances, or as otherwise provided for in this Manual.

20. A member shall not consume any intoxicant while on duty except when required in the performance of duty. A member while assigned to duty in civilian clothes may use intoxicants, if this is absolutely necessary in the performance of duty. Under no circumstances shall medically defined intoxication be considered justifiable.

21. A member in uniform shall not enter any premises, the primary purpose of which is to sell or store intoxicants, except in the immediate performance of police duty.

22. A member shall not have intoxicants on his person while on duty or in uniform, or in or on any Police Department building or vehicle, except for evidentiary purposes.

23. A member shall not report for duty under the influence of intoxicants or with the odor of intoxicants on his breath. Either condition shall cause the member to be considered unfit for duty. Superior officers shall not assign to duty any member in unfit condition due to the use of intoxicants and shall immediately relieve of duty, without pay, any member found on duty in such unfit condition.

24. A member shall not use narcotic, hallucinatory, stimulating, or dangerous drugs while on duty or off duty, unless prescribed by a physician for illness.

25. A member shall not engage in gambling of any form while on duty, or at any time or place prohibited by law, except as required in the pursuit of his duty or as required by his duty or as required by his commanding officer.

26. A member shall maintain personal habits of cleanliness and hygiene; his hair shall be neatly trimmed and he shall be clean shaven at all times, except when necessary for the performance of duty or by approval of the Chief of Police.

27. A member may remove his headgear while in the patrol car, at church, attending a funeral, a wedding, prayer in a public place, eating a meal, while at Headquarters, or while in court. For any official business such as issuing traffic citations, checking a place of business, making an arrest answering a call, etc., the member will be required to wear the headgear.

28. A member on duty shall be properly uniformed and neat and clean in personal appearance. This rule applies to off-duty status, if the uniform is worn.

29. A member shall wear uniform in accordance with appropriate procedural instructions.

30. A member in uniform shall not carry an umbrella, package, or like object, except when necessary for the performance of duty.

31. A member shall not smoke or chew gum while in the process of conducting police business such as issuing traffic citations, working traffic assignments, interviewing complaints or suspects while at headquarters, affecting an arrest, checking a place of business, etc. Smoking while on routine patrol is not accepted.

32. A member shall not chew tobacco while on duty.

33. A member shall not incur personal debts that he is unwilling or unable to pay.

34. A member shall not incur liability chargeable to the Police Department without proper authorization. Pecuniary liability for such improper or unauthorized actions shall rest with the member incurring the debt, disciplinary actions notwithstanding.

35. A member shall not act as a co-maker, guarantor, or endorsee for any money borrowed by another member, nor shall he induce or attempt to induce another member to act as such for money borrowed by himself. This prohibition shall not apply to transactions of the Municipal Employees Credit Union.

36. A member shall not act as a surety on a bond or recognizance for any person arrested other than himself or members of his immediate family. He shall notify his own unit or watch commander of such actions within four hours of its occurrence.

37. A member shall not borrow money or other valuables from another member, nor shall members make loans of money or other valuables to another, except in amounts totaling $5 or less or where such loan involves, tools, machines, or similar objects for immediate use and where such items are not held in security for pawn.

38. A member shall not recommend or suggest to any citizen the services of any lawyer, bondsman, or undertaker.

39. If a member or any of his immediate family becomes involved in a situation requiring police attention, he shall summon another officer to handle the situation, unless of an emergency nature.

40. A member shall not join or associate with any organization designed to interfere with the orderly process of justice or government by illegal means, nor any organization which advocates prejudice against any racial, religious, or other group.

41. No member shall use any departmental property for his own private benefit. No member will conduct private business while on duty except in urgent matters, and then only with the approval of his commanding officer.

42. A member of the Police Department shall not communicate to any person any information which may enable a person to escape from arrest or punishment, or that may enable him to dispose of or secrete any goods or other valuable things stolen or otherwise unlawfully obtained.

## PATROLMEN RULES OF CONDUCT

While all members of the police force are required to follow the Rules of Conduct as set forth in the previous section, the following Patrolmen Rules of Conduct are directed specifically to those members of the police force who are assigned general patrol or beat duties. References to "he" or "his" are for convenience only, and these rules shall apply equally to both male and female members.

A patrolman shall be responsible for the efficient performance of his duties in conformity with the policies and procedures of the Department. His duties and responsibilities include, but are not limited to the following:

1. He shall exercise authority consistent with the obligations imposed by his oath of office and be directly accountable to his assigned supervisor, promptly obeying all legitimate orders.
2. He shall maintain harmonious relationships with his associates by courthouse and considerate demeanor, guarding himself against envy, jealousy, or other unfriendly feeling, and refraining from all careless communications to their discredit.
3. Where such discretion is permitted, a member shall coordinate his efforts with those of the other members of the sector, watch, or other department elements so that their teamwork may insure continuity of purpose and optimum achievement of service program objectives.
4. He shall communicate to his superiors and to his co-workers all information he may obtain which is pertinent to the achievement of common objectives, including when applicable, the supervision and guidance of school crossing guards or other civilian members of the Department.
5. He shall be subject to recall at any time in case of special needs or emergencies. Ordinarily his hours of duty will be established by his superiors. He shall respond punctually to all of his assignments.
6. A patrolman shall be responsible to his supervisor within his assigned patrol beat, for:
   a. Protection of life, property, and individual rights.
   b. Prevention and suppression of criminal activity and disturbances.
   c. Recovery and return of stolen and lost property.
   d. Apprehension and assistance in the prosecution of offenders.
   e. Prevention of accidents and the regulation of traffic.
   f. Preservation of the peace.
   g. Other service to the public as requested or necessary.
7. He shall, by continual study and research, be familiar with the techniques and ideas designed to improve police performance.
8. He shall assist in the department programs for:
   a. Improving efficiency and cooperation in areas of common responsibility.

# SAFETY BELT POLICY

## USE OF SAFETY BELTS/RESTRAINING DEVICES
## IN DEPARTMENTAL VEHICLES

STATUS: Need to Reference

Effective Date:
Review Date:

---

I.     PURPOSE

To mi'mize the possibility of deaths or injury as a result of accidents involving drivers and passengers in departmental vehicles.

II.     POLICY

There is available evidence from the National Highway Traffic Safety Administration (NHTSA) studies indicating that occupants wearing seat belts have experienced 65% fewer serious injuries and 50% fewer deaths than occupants not wearing seat belts. There is also evidence that seat belts are effective in assisting officers in maintaining proper control of their vehicles in pursuit and/or emergency high speed operations. It shall be the policy of this agency that all personnel, including non-employees, shall wear the safety belt restraining system while operating or riding as a passenger in a department vehicle when the vehicle is in motion, except where specifically exempted.

III.     PROCEDURE

This policy shall not apply to persons occupying a seating position that is not equipped with a safety belt assembly, or to any personnel possessing a written indication from a physician that for medical or physical reasons the person is unable to use the safety belt system.

Unless a replacement vehicle is unavailable, no person shall operate a departmental vehicle in which any belt in the front seat is inoperable. It shall be the responsibility of the driver to give notice of inoperable safety belts.

An office operating in an undercover capacity may be exempt only if in the judgement of the officer, the officer believes the use of the safety belt will comprise their identity.

1

      b. Advancing the departmental program for earning community confidence and support.

      c. Proper and economical use of departmental property and equipment.

9. He shall acquire and record information concerning events that have taken place since his last briefing and be attentive to instructions.

10. He shall, unless otherwise ordered, report to his supervisor for inspection, instruction, and dismissal at the conclusion of his tour of duty.

11. He shall record his activity during his tour of duty in prescribed manner and shall complete and submit reports of crimes, motor vehicle accidents, and other incidents in conformity with established procedures.

12. He shall supervise and inspect all public places and activities within his assigned area and enforce all laws, ordinances, and regulations concerning their operations.

13. He shall devote the maximum possible time to the performance of his basic duties, remaining in police facilities only when necessary.

14. Before beginning his tour of duty, he shall inspect the vehicle assigned to him and report any damage or deficiency. He shall not operate any vehicle which is legally not fit or unsafe for use.

15. During his tour of duty, he shall use the vehicle assigned to hi in the most safe and economical manner, avoiding hazardous or careless operation.

16. He shall promptly report, on prescribed forms, all accidents involving the vehicle assigned to him or any vehicle he is using, operating, or causing to be towed or impounded.

17. When assigned to tasks other than general patrol, he shall diligently perform the duties necessary to efficient, effective, and economical operations.

18. He shall receive, service, and prepare returns on citations, writs, and documents providing information to enable subsequent service if unable to service.

19. He shall exert every effort to satisfy the needs of citizens requesting service, assistance, or information, and courteously explain any instance where jurisdiction does not lie with the Police Department, suggesting procedures to be followed, and assisting further if the citizen is ill, confused, illiterate, or unable to do so for good reason.

20. He shall insure the civil treatment and observance of legal rights of all persons coming with his scope of authority.

21. He shall be accountable for the securing, receipting, and proper transporting of all evidence and property coming into his custody.

22. He shall be diligent in his efforts to discover and suppress illicit traffic in liquor, gambling, narcotics, and prostitution, reporting such activity to his superiors when it is discovered.

23. He shall enforce traffic laws and ordinances and seek to eliminate conditions interfering with the safe and expeditious movement of vehicles and pedestrians. He shall be alert to

the need for improvement in traffic control and report defective traffic signs, signals, and devices or other safety hazards.

24. When directing the movement of vehicular traffic, he shall take a conspicuous and safe position, making his signals clear and positive, utilizing the hand signals authorized by departmental procedures.

25. He shall be sensitive to the conduct of youths and young adults and the existence of hazards affecting them and participate in the delinquency control effort.

26. He shall be alert to community tensions of various types, notifying his superiors of potentially dangerous or undesirable situations and preventing disorder.

27. He shall be alert to the conditions tending to cause crime, take preventive action, and notify his superiors of the situation and the action he has taken. He shall inform citizens of conditions which they can correct to prevent crime.

28. He shall determine the degree of security of business places after their normal working hours when necessary for burglary and fire prevention. He shall inspect selected buildings reported unoccupied to see that they are secure. If any evidence of tampering or entry is found, he shall immediately summon aid to search the premises and apprehend the trespassers.

29. He shall stop and interview any person whom he reasonably and justifiable believes to be engaged in unlawful activity, request the reason for his presence, and record his identity as prescribed. If he receives answers indicating a reasonable probability that a crime had been committed by the person, is refused an answer, or is met with resistance not warranted by the inquiry, he shall make an arrest, provided there is a legal basis for the arrest, or shall include the suspicious circumstances in a report that appropriate follow-up action may be taken.

30. He shall note and record the license numbers and description of vehicles seen under questionable circumstances and make an investigation.

31. He shall familiarize himself with his area of assignment and conduct a diligent patrol, accentuating prevention rather than apprehension, giving particular attention to locations most susceptible to the occurrence of crime or traffic accidents.

32. He shall become familiarize with the geography of the city, including public transportation routes, locations of streets and highways, prominent and important buildings and locations, transportation centers, and other information and assistance, when requested.

33. He shall confine his basic patrol efforts to his area of assignment. If required to leave for any reason, he shall request permission of his supervisor and the dispatcher prior to the time he leaves, or as soon as possible if in an emergency situation. He shall notify the dispatcher of any interruption to patrol activity and obtain permission to go out of service.

34. Upon discovery of a crime, he shall move promptly to apprehend the offender, either through individual effort or by full utilization of departmental resources. When pursuit or

apprehension is not feasible, he shall make a thorough investigation and speedily relay information to other units or agencies, normally through the Communications Center, to enlist their aid.

35. He shall conduct a thorough investigation of all offenses within his area of assignment and scope of activity. He shall collect evidence and record data which will aid in identification, apprehension, and prosecution of offenders and the recovery of property.

36. He shall be responsible for the movement of traffic as necessary at the scene of accidents, fires, and heavily congested areas when so assigned by the Communication Center.

37. He shall enforce parking regulations in the downtown and other assigned areas, be responsible for the direction and movement of motor vehicle traffic to prevent or alleviate congestion at downtown intersections and other regulation and enforcement necessary for the safe movement of pedestrian traffic.

38. He shall use radar machines/guns and other devices for speed law enforcement as need dictates. On each day that radar devices are used, they shall be properly tuned and checked for accuracy. Such accuracy checks shall be reported to the Communications Center where it shall be documented in the Radar Machine Log.

39. He shall provide prompt and adequate assistance to sick, injured, or destitute persons.

40. He shall be alert to the City's responsibilities to keep public highways, streets, avenues, alleys, sidewalks, lights and signals, public grounds, bridges, and viaducts open and/or operable, in good repair, and free from nuisance and shall cause notice to be given to the appropriate city, county or state agency concerning unsafe or improper conditions.

41. He shall inspect places or activities where permits or licenses are required and shall take appropriate action in all instances where necessary authority has not been procured.

42. He shall note conditions which adversely affect the appearance, safety, and health of the community, enforcing applicable laws, ordinances, and regulations and/or making referrals to agencies having primary responsibility.

43. When detailed to the location of any assemblage of people, he shall be alert to prevent injury to persons, disorder, or damage property.

44. When in uniform, he shall assist in the movement of vehicles operating under emergency circumstances.

45. He shall take necessary and appropriate action whenever circumstances dictate, whether in or out of his assigned work area or on or off duty.

46. When any police officer makes an arrest, the subject's rights shall be read to him/her.

## COMMAND AND SUPERVISORY PERSONNEL

1. The general command and supervision of personnel shall be the duty and responsibility of those persons so officially designated by the Chief of Police.
2. Responsibilities and duties of command and supervisory personnel are delineated below. They shall:
    a. Exercise authority commensurate with their responsibility.
    b. Be considered a part of the Department's administrative staff and shall function on behalf of management.
    c. Take proper police action concerning any violation of the law committed in their sight or reported to them for they are always policemen.
    d. Exercise authority with firmness and impartiality and under no circumstances permit personal attitudes to influence decisions.
    e. Support the philosophy that the people of the City are entitled to the highest level of police service the Department can provide and shall direct the efforts of their commands accordingly.
    f. Set an example for all subordinates in sobriety, dignity, courtesy, discretion, skill, diligence, and the observance of proper discipline.
    g. Be diligent in obtaining the observance of the high ethical standards in the performance and conduct of personnel under their commands.
    h. Promptly obey and transmit all legitimate orders of higher authority, insuring uniform interpretation and full compliance, and convey both the intent and spirit of orders and directives.
    i. Perform such administrative duties as necessary, including planning, organizing, and directing the activities of their commands.
    j. Establish the required details and assignments necessary to carry out the functions of the responsibility and be guided in the assignment of personnel by the complement available for assignment and the necessity for assigning personnel where they are needed.
    k. Maintain a harmonious relationship with other elements of the Department, allied agencies, and the public.
    l. Assist in the administration of the departmental programs for: training personnel, improving working conditions for optimum efficiency and morale, using personnel records and performance rating for individual guidance and improvement, recognizing outstanding personnel performance, improving efficiency and cooperation in areas of common responsibility, advancing a sound departmental program for earning community confidence and support, and the proper and economical use of department property and equipment.

m. Keep informed of the affairs of their commands at all times and be assured that the duties of subordinates are properly discharged.

n. Maintain records to enable objective performance evaluations for personnel under their command.

o. Sustain the actions of a subordinate when he is acting properly and within his rights.

p. Support supervisory subordinates by taking appropriate action whenever the subordinates are conscientiously exercising their disciplinary responsibilities.

q. Investigate, or cause to be investigated, all cases of alleged misconduct by personnel of their commands, taking appropriate action or making appropriate recommendations according to established procedures.

r. Avoid, insofar as circumstances allow, censuring a subordinate in the presence of others.

s. Submit to their respective superiors, in the prescribed form and detail, such reports as may be required to accurately reflect the problems, services, and activities of their command.

3. Line and staff command responsibilities include the following:

a. The exercise of staff supervision should not violate the principles of unity of command. Whenever a correction is to be made, it must be through the supervisor in command of the operation which requires correction. Except in the following situations, a staff supervisor should not issue direct orders to a subordinate who is operating under the command of a line supervisor:

    i. Emergencies demanding immediate action to save life or prevent injury, to avoid jeopardizing the Department's reputation or those tending to interfere with the accomplishment of the police purpose.

    ii. Routine dispatching or the giving of orders by a staff officer by authority of one who has line responsibility.

b. A staff supervisor shall report failure in the performance of duty of any line personnel to the commander or supervisor of the element involved and to his own immediate superior.

## Vehicle Pursuits

Efficient pursuit, interception and apprehension of criminal subjects are within the public expectation of efforts police must take to prevent and deter actions by subjects which threaten human lives. It is the policy of the Lexington Police Department to pursue fleeting subjects in a manner that is consistent with our moral and legal obligation to make reasonable efforts to apprehend fleeing subjects with reasonable, prudent consideration for the safety of our officers and the community as a whole. Officers and/or supervisors shall terminate any vehicle pursuit when the dangerousness created by the pursuit itself outweighs any known threats and dangers posed as a result of the suspect(s) escape.

A. Primary Vehicle(s) – The first police vehicle actively pursuing and behind a fleeing vehicle

B. Secondary Vehicle(s) – Any police vehicle not actively involved in the pursuit of a fleeing vehicle, but in a position to provide assistance by blocking and safe-guarding other motorists on the roadway and setting up roadblocks to slow/stop an active pursuit.

C. Emergency Equipment – devices in/on police vehicles that emit audible and/or visual signals to warn others of the presence of an emergency vehicle or used to signal traffic law violator or criminal suspect to pull to the right-hand side of the road.

1. Vehicle pursuits are initiated by police officers when a driver purposefully eludes the officer's attempt to conduct a traffic stop by signaling the driver with blue lights and sirens when necessary to pull over.

2. Officers deciding to actively pursue any vehicle must weigh the risk created by the pursuit itself against any risk and/or danger created by not immediately apprehending the suspect(s).

3. Officers shall consider the following in their decision to continue a pursuit:

   a. The seriousness of the original offense and its relationship to public safety;

   b. Time, day, visibility, and location of the pursuit;

   c. Availability of secondary and backup units;

   d. Weather and roadway conditions;

   e. Traffic conditions and pedestrian traffic;

   f. The officer's familiarity with the roads and location;

   g. Capability and quality of the police equipment including the police vehicle and communications equipment;

   h. Speed of the pursuit and evasive tactics used by the eluding driver;

   i. Type of vehicle being pursued. The pursuit of a motorcycle, all-terrain vehicle, or large commercial vehicle shall be terminated if the driver engages in dangerous evasive tactics unless the situation would otherwise allow the use of deadly force.

   j. The known identity of the eluding driver and the future probability of future apprehension if the pursuit was terminated.

4. Active pursuit of a feeling vehicle will be limited to a Primary vehicle and one Secondary vehicle, except as otherwise directed by a supervisor when circumstances exist that warrant the need for additional personnel. All officers actively involved in a pursuit will continuously use the emergency lights and sirens on their police vehicle. Police vehicles not equipped with emergency equipment shall **NOT** be involved in any vehicle pursuit.

5. The officer initiating the pursuit will serve as Primary Unit and be responsible for continually notifying dispatch via the police radio of the following:
   a. Direction of travel;
   b. Description of the vehicle;
   c. Number of occupants and any identifying information such as race and gender if known;
   d. Known offenses for which the driver is being pursued;
   e. Speed and behavior of the fleeing vehicle;
   f. Exact location of where the pursuit ends, and;
   g. The need for emergency medical services for any person injured during or at the completion of any pursuit.

6. Unmarked police vehicles and those vehicles not specifically designed for police-pursuit driving may only serve as the Primary Unit until a marked unit actively engages in the pursuit and the unmarked vehicle becomes the Secondary Unit. These specific police vehicles may serves as a s Secondary unit only until two marked pursuit-rated units are actively engaged in pursuit.

7. To avoid a pursuit altogether, marked and unmarked units may be used to box in a unaware suspect(s). Once an active pursuit is engaged, boxing in a suspect is **NOT** an option.

8. An active pursuit does not relieve nor protect the officer from the consequences of a reckless disregard for the safety of others.

9. All officers involved in a pursuit, either actively pursuing a fleeing vehicle or serving in a backup capacity, shall operate their vehicles with due regard for public safety of all citizens. Although officers actively engaged in a pursuit are not required to come to a complete stop as a red light, stop sign, or other controlled intersection, officers must ensure that other drivers have granted right-of-way to their vehicles before entering a controlled intersection.

10. All pursuing vehicles shall maintain an adequate distance to ensure adequate reaction and braking time.

11. Officers shall **NOT** bump and/or ram a fleeing vehicle unless circumstances exist that justify the use of deadly force.

12. All officers involved in the pursuit, either actively involved or serving in a backup capacity, shall complete a written report documenting all of the facts and circumstances as to their involvement prior to the end of their shift.

13. Secondary Units will assume responsibility for continually advising dispatch of the details of the pursuit. Secondary Units will stay ready to assume the role as Primary Unit in the event the Primary Unit is no longer able to pursue.

14. Backup Units are **not actively** involved in a vehicle pursuit but serve to provide assistance to pursuing units **by blocking** intersections to direct the pursuit and protect other drivers in the roadway.

15. Backup officers are those officers on the fringes of the pursuit and in the areas in which the pursuit is traveling. No unit shall parallel the pursuit route unless authorized by a supervisor.

16. Once an officer initiates a pursuit and advises the dispatch center, the dispatch shall:

    i. Isolate pursuit related radio traffic to a specific channel and direct all other units to use another channel.

    ii. Provide another radio channel to dispatch and direct units not actively involved in the pursuit to that channel.

    iii. Request specific information from pursuing officers if the officers are not transmitting directly related to the pursuit so to advise and update the on-duty supervisor.

    iv. Immediately advise a field supervisor of essential information so to ensure continuous monitoring of the pursuit.

    v. Receive and record all incoming information on the pursuit and the pursued vehicle in the Dispatch Log.

    vi. Coordinate and dispatch back-up assistance as directed by the field supervisor.

    vii. Notify neighboring jurisdictions, when practical, that the pursuit may extend into their locality.

17. Once notified of an active vehicle pursuit, supervisors will:

    i. Continually monitor all radio traffic;

    ii. Decide if the pursuit may be continued or shall be terminated;

    iii. Direct backup units as necessary to provide assistance;

    iv. Decide if a roadblock is a viable option and direct units to a location to setup, and;

    v. Authorize additional personnel as deemed necessary based on the severity of the offense that justifies the pursuit.

18. The supervisor will conduct a review at the conclusion of any vehicle pursuit. The supervisor shall respond to the location where the pursuit ends or the officer's location of where the pursuit was terminated to complete "Vehicle Pursuit Incident Form". The supervisor will review the pursuit with regards to established policy and forward the form to the Chief of Police via their Chain of Command. If the primary officer is the On-Duty Supervisor, the supervisor will complete the report and submit it to the Chief of Police for approval.

19. When the decision to terminate the pursuit is made, the primary officer and/or supervisor shall notify dispatch via the police radio that all units shall terminate. All police units will turn off their emergency equipment and pull to the side of the road and stop at the earliest safest place and advise the dispatcher of their exact location. Officers that were actively involved in the pursuit will wait for the supervisor to arrive and complete their incident review. All back up officers will simply return to duty once they have notified the dispatcher of their stop location. Pursuits shall be terminated when:

    i. Driving against traffic on the wrong side of the road;

    ii.  Disregarding red lights, stop signs, and other traffic control devices, and;

    iii.  Excessive speeds with respect to environmental and traffic conditions.

20. There is a malfunction of police equipment and/or the police vehicle;

21. The offender is identified and the failure to apprehend the offender during the pursuit poses no immediate threat of death or seirous injury to another person;

22. The distance between the pursuing officer and the violator is so great that further pursuit is futile;

23. The officer loses visual contact with the violator for an extended period of time.

24. Officers shall not become involved in any pursuit when a passenger is present in the police vehicle that is not a sworn law enforcement officer. If it becomes necessary for the officer to become involved, the officer shall safely and responsibly remove the passenger from the vehicle in an area that is not an inherent threat to their safety.

25. Lexington Polce Department employees are subject to the guidelines and restriction set forth in this policy regarding pursuits and **NOT** to the policies and procedures of other agencies that pursue subjects into the City of Lexington.

26. Circumstances Regarding Pursuits Entering the City of Lexington

    1) Officers may only assist an agency in active pursuit coming into the City of Lexington when:

      (a) The pursuing agency has requested assistance or the officer observes the pursuit prior to agency notification, and;

      (b) The Chief of Police approves the assistance after consideration of pursuit circumstances

    (2) Supervisors may grant permission for officers to serve a backup function by allowing officers to:

      (a) Block intersections to protect other motorists;

      (b) Respond to the area of where a pursuit concluded to assist with the capture of the suspect(s)

    (3) Dispatchers will contact the agency involved to begin sharing information; (due to limited radio communications with other agencies, supervisors will reevaluate the pursuit and terminate if necessary)

27. When a pursuit initiated by LPD Employees leaves the City of Lexington and enters another jurisdiction:

    (1) The primary officer will notify dispatch of direction of travel and jurisdiction being entered;

    (2) The supervisor will evaluate the entire incident and decide if the ursuit sshpuld continue or be terminated;

    (3) The supervisor will determine the number of unites to remain actively involved in the pursuit of the decision is made to continue;

    (4) The dispatcher will notify the involved jurisdiction and request assistance.

28. Because of the close proximity of other jurisdictions, it is reasonable that other agencies may become involved in pursuits in the City of Lexington. Officers will notify dispatch when an officer from another agency becomes actively involved in the pursuit. The dispatcher will notify the supervisor for further instructions.

29. In any incident where a pursuit enters the City of Lexington and then leaves the jurisdiction any officers that become involved in the active pursuit will terminate once the pursuit leaves the city if two or more vehicles from outside agencies are already involved. If only one vehicle from an outside agency in involved in active pursuit, the supervisor may authorize further assistance and units to continue in active pursuit.

30. Stationary Roadblocks are authorized to help minimize injury and/or property damage under the following criteria:

    1) Roadblocks may only be used with a supervisor's approval;
    2) Roadblocks may be setup when clear visibility exists to traffic in all directions and to all roadway users;
    3) Roadblocks will only be used as a last resort by those officers trained in safe and legal aspects of road-blocks;
    4) Emergency lighting shall be used continuously when a police vehicle is used as a stationary road-block;
    5) Police Vehicles will **NOT** be occupied by any person when in position for a road-block;
    6) Privately owned vehicles, or police vehicles not equipped with emergency lighting, will **NOT** be used in a road-block;
    7) A reasonable escape route shall be established in such a manner to allow the suspect vehicle maneuverability at a reasonable speed. Escape routes also serve to direct the pursued vehicle to a location better suited to bring the pursuit to a safe end;
    8) The suspect vehicle shall be allowed a reasonable stopping distance;
    9) All vehicles and persons not directly involved in the road-block shall be removed from the immediate area;
    10) Officers will not place themselves in the road-block in such a position to be in-line with the oncoming suspect vehicle.

31. The Command staff will collectively review and analyze all pursuits annually so to address policy, training, and equipment needs and document such analysis. In the event that no pursuits occurred during an evaluation period a simple memo shall be prepared to document that no pursuits occurred and any additional training that took place during the period.

## POLICE DEPARTMENT- USE OF FORCE

1. The use of unnecessary force or abuse to prisoners or other persons is prohibited, but failure to use the proper force when necessary may be considered neglect of duty.

2. The range officer or designee shall inspect all non-department issued weapons carried by police officers. All non-department issued weapons will be approved by the range officer or designee prior to being used for general police duty. If a weapon is deemed unfit for use, a memo will be sent to the Chief or his/her assistant stating the same.

3. The range officer or designee shall record the serial number and general description of the weapon(s) and name of the approving officer on the appropriate forms of any weapon carried by police officers, whether on-duty, off-duty, extra-duty, or overtime if such a weapon is not a Department issue. The only exception to this requirement shall be hunting and sporting weapons.

4. The range officer or designee shall inspect Department issued service revolvers on an annual basis. If, during an inspection, a weapon is found to be in substandard condition through improper care or abuse, the police officer to whom the weapon is issued shall be held financially responsible for any necessary repairs.

5. All police officers are required to qualify a minimum of twice a year on an approved firing range by an approved firearms instructor. A list of police officers failing to qualify will be forwarded to their supervisor for proper handling.

6. When a weapon is discharged and bodily injury or death of an individual occurs, the appropriate department will be notified and an investigation conducted.

7. All investigations of shooting incidents involving police officers where a person is injured or killed shall be conducted in accordance with regular investigation procedures and shall be directly supervised by an officer of the rank of Lieutenant or above.

8. A member shall never brandish a weapon, nor shall he remove his revolver from its holster, other than:
   a. To defend himself from death or serious injury;
   b. To defend another person unlawfully attacked from death or serious injury;
   c. To effect the arrest or prevent the escape, when all other means fail, of a convicted felon, or of a person who has committed a felony in the policeman's presence;
   d. To kill dangerous animals, or to kill an animal so badly injured that humanity requires its release from further suffering;
   e. To give an alarm or to call assistance for an important purpose when no other sufficient means can be used; and
   f. To engage in training or inspection and cleaning of the weapon.

9. Auxiliary weapons will not be carried on any police officer's person or in Department vehicles without the approval of the Chief of Police.

Examples of Auxiliary Weapons are:

    a. A firearm carried in addition to the service revolver or its equivalent.

    b. A firearm carried in addition to the regular firearm carried by police officers assigned to non-general police uniform duties.

        Note: Weapons issued by the Department to aid in the performance of specific duties – for example, shotguns – shall not be considered as auxiliary weapons for purposes of these provisions.

10. No police officer will carry any type of fully automatic weapon on his person or in a Department vehicle unless so ordered by a supervisor.

11. When using a chemical agent, the baton, or any other physical force in those instances that threaten the safety of a police officer or other persons, or to subdue and arrest combative individuals, the details of such use will be reported on an intra-office memorandum directed to the Chief of Police.

Details will include:

    a. Type of force used.

    b. Reasons for the use of force.

    c. Extent of injury to the suspect.

    d. Other pertinent information the police officer wishes to include.

1. **Definitions**

   **A.** <u>Deadly Force</u> – Any physical force that can reasonably be expected to cause death or serious bodily injury. Lethal force is an extreme measure and shall only be used in accordance with the law.

   **B.** <u>De-Escalation</u> – a tactic designed to place officers in a position of advantage when dealing with a/an irrational, unpredictable, or suicidal person.

   **C.** <u>Excessive Force</u> – force applied recklessly that is unreasonable in light of the facts and circumstances.

   **F.** <u>Force</u> – Any physical strike, or contact with an instrument of a person; any intentional attempted physical strike or instrumental contact that does not take affect; or any significant physical contact that restricts the movement of a person. The term includes: aiming of a firearm, discharge of a firearm, use of chemical agents, use of impact weapons, use of electronic control weapons, taking a subject to the ground, and any physical contact that includes control techniques. The term does not include escorting or handcuffing a person with minimal or no resistance. Use of force is lawful if it is objectively reasonable under the circumstances to affect an arrest, or protect the officer or other person.

   **E.** <u>Non-Deadly Force</u> – Actions not reasonably calculated under the circumstances to cause death or serious bodily injury.

   **F.** <u>Probable Cause</u> – The totality of facts and circumstances within a police officer's knowledge, of which he or she has reasonably trustworthy information, that would cause a prudent person to believe, under the circumstances show, that the subject has committed, is committing, or is about to commit an offense.

   **G.** <u>Serious Bodily Injury</u> – harm that creates substantial risk of death, serious permanent disfigurement, or loss or impairment of any bodily function or organ.

   **H.** <u>Unresisted Handcuffing</u> – Incidents in which a subject complies with the officer's verbal commands and/or unresistingly allows the officers to position their arms in order to apply handcuffs, or the subject positions their arm as commanded for the application of handcuffs.

   **I.** <u>Weapon</u> – Any instrument, article or substance, including a vehicle, which, under the circumstances in which it is used, attempted to be used, or threatened to be used, is readily capable of causing death or other serious bodily injury.

2. **Levels of Resistance**

   The use of force by police officers is governed by the principle of "objective reasonableness" and is controlled by the basic elements of a reasonable officer's perception and a reasonable officer's response at the specific moment. Based on this principle, officers may use only the necessary force to accomplish legally justified

objectives, such as to make arrests and protect from injury or death bystanders, suspects, and other officers.

Legally justified objectives, for which force may be used, include, but are not necessarily limited:

    **A.** To preserve the public peace:

    **B.** To defend themselves, or others against unlawful violence;

    **C.** To prevent the commission of self-inflicted injury or suicide by any person;

    **D.** To make lawful arrests or searches and/or to overcome resistance to such arrests or searches;

    **E.** To prevent escape from custody, and;

    **F.** To prevent or interrupt an intrusion on, or interference with the lawful possession of property.

**3. Application of Deadly Force**

**A.** Lexington Police Officers are authorized to use deadly force when:

    **i.** There is immediate and serious danger of serious bodily injury or death to an officer or bystander, or;

    **ii.** The suspect has demonstrated dangerousness by the previous use or threatened use of deadly force.

**B.** Instances when deadly force may be the appropriate response include, but are not necessarily limited to:

    **i.** The officer has probable cause to believe that the suspect has committed a crime involving death or the infliction or threatened infliction of serious bodily harm and continues to present an immediate threat of death or serious bodily harm to others;

    **ii.** The officer has probable cause to believe that a fleeting felon poses an immediate threat of death or serious bodily harm to the officer(s) or others;

    **iii.** When attempting to recapture an escaped felon whom the officer has probable cause to believe that if the apprehension were delayed, there would be an immediate threat of death or serious bodily harm to a member of the community.

**C.** Special Consideration concerning the use of deadly force include:

    **i.** Suspicion and/or flight alone ARE **NOT** sufficient objectives for the use of deadly force;

    **ii.** Officers are not justified to use deadly force to affect the arrest of a misdemeanor offender; unless the arrest is met with resistance by the

        suspect that escalates to the point the officer must defend himself or
        another person from death or serious bodily injury;

iii.    Whenever possible, the officer will announce their intention to arrest
        and/or use force of any type;

iv.    Officers shall not use deadly force when it appears likely that an innocent
        person may be injured except in a situation that is imminently life
        threatening to the officer or another person;

v.    Officers may unholster and display their weapons when the possibility of
        danger to themselves or another person exists;

vi.    Deadly force shall **NOT** be used as a warning or threat or with the intent
        to maim or cripple a person.

vii.    "Warning Shots" are the intentional discharging of a weapon for the
        purpose compelling compliance. **WARNING SHOTS ARE STRICTLY
        PROHIBITED.**

viii.    Firearms shall NOT be used to shoot from or at a moving vehicle, unless
        no other reasonable means of force exists for the emergency circumstances
        at hand.

**D.** Choke Holds and Neck Restraints

Neck restraint and choke hold techniques are intended to temporarily incapacitate a
person by restricting an individual's ability to breathe. They are applied by exerting
pressure on one or both sides of one's neck to inhibit blood flow through the carotid
arteries and air flow through one's airway and is typically accomplished with use of one's
hands or constricting instrument.

Because of the possibility of incorrectly applying these types of force and the effects such
as misapplication could happen, the use of these types of restraints are prohibited as a
less-than-lethal force option.

**4.  Deadly Force Incident Response**

When incidents involving the use of deadly force occur (including the intentional
discharge of a firearm where no injuries occur), all officers will assist in every way
possible with the investigation. This including remaining in-service for call taking once
the scene has been secured and command of the scene has released officers not directly
involved in the incident or its investigation.

**A.** Officer Responsibilities- officers directly involved in a deadly-force incident shall:

i.    Make all reasonable attempts to secure the suspect(s) and scene for the safety of
    bystanders and responding back-up first responders. Suspect(s) that have been
    shot by officers shall be handcuffed;

ii.    Notify dispatch via the police radio of the incident and request emergency
    medical assistance;

    iii.   Refrain from making any statements to the media, other officers, or supervisors beyond the initial briefing of the first responding supervisor;

    iv.   Refrain from discussing the matter between officers or witnesses (if more than one officer);

    v.   Refrain from completing any reports or non-administrative statements for at least twelve (12) hours.

**B.** First Responders Responsibilities – first officers not directly involved in the deadly-force incident that respond to the scene shall:

    i.   Ensure the safety of all officers involved;

    ii.   Establish a scene command and begin setting a perimeter (perimeters should be set larger than what is actually needed to provide investigators with additional space to conduct the investigation);

    iii.   Establish a crime-scene log and record all persons entering and exiting the scene;

    iv.   If suspects are not in custody or not on scene, begin transmitting descriptive information (including personal and vehicular descriptions) to dispatch to be broadcast to other officers and nearby law enforcement agencies;

    v.   Only relinquish command of the scene to a responding supervisor.

**C.** Dispatcher Responsibilities – dispatchers notified of an officer involved deadly-force incident shall:

    i.   Immediately limit traffic on the radio channel to emergency traffic only for officer(s) on scene and open another channel for other traffic;

    ii.   Notify area units to respond and secure the scene;

    iii.   Notify the on-duty supervisor to respond to take command of the scene;

    iv.   Continuously monitor radio traffic and log all radio transmissions in the dispatch log;

    v.   Immediately notify the Chief of Police via telephone.

    vi.   Notify any additional Command Staff as directed by established Dispatch Standard Operating Procedures

    vii.   Upon approval of Chief of Police and/or Commander and as directed by the on-duty supervisor, contact the Mississippi Bureau of Investigation and request investigators respond to the scene.

**D.**    Supervisor Responsibilities – supervisors responding to the scene shall assume command of the scene and:

    i.   Request additional resources and medical assistance as needed;

    ii.   Move officers involved to a quiet location to remove them from the scene and arrange for their transportation back to the police station;

   iii.    Interview the officer(s) involved regarding the facts of the incident so to ascertain a brief understanding of the incident. *A more detailed briefing will be conducted at a later time*;

   iv.    Advise officer(s) involved that an investigation will occur concerning the incident, and that they may seek legal counsel;

   v.    Advise the officer(s) involved to refrain from discussing the incident with anyone, except agency personnel or agency attorney, or department investigator until the preliminary investigation is concluded;

   vi.    Notify Command Staff and investigators of details regarding the incident and seek further instruction;

   vii.    Upon notification of the Chief of Police, or Commander, ensure the on-duty dispatcher has notified the Mississippi Bureau of Investigation and requested that investigators respond to the scene;

   viii.    Allow the involved officer(s) to notify their families about the incident as soon as possible.

**E. Employee Intervention**

Any employee present and observing another officer using force that is clearly beyond that which is objectively reasonable under the circumstances and/or are clearly in violation of this policy and/or law, shall, when in a position to do so, intervene to prevent the use of unreasonable and/or excessive force. An employee who observes another employee use force that exceeds the degree of force permitted by law and policy should promptly report the incident to the Chief of Police via their chain of command.

**F. Removal From Duty**

Any employee whose actions, omissions, or use of force, while in an official capacity, lead to the death or serious bodily injury of any person, or if another person dies while in one's custody, they shall be immediately removed from any line-duty assignment pending an administrative review as directed by the Chief of Police.

Any police officer whose use of force causes death or serious bodily injury shall be placed on administrative leave pending the completion of any internal investigation requirements. The Chief of Police retains the right to immediately allow any officer on administrative leave to return to normal duty, or other light-duty assignment, prior to the completion of the internal investigation.

All officers directly involved in an incident where deadly force is employed, shall undergo counseling and evaluation by a mental health professional as soon as practical after the incident before his or her return to normal duties. After the counseling sessions, the mental health professional will advise the agency:

        A. Whether it is in the officers' best interest to return to unrestricted duty, be placed on administrative leave or light duty, and for how long;

        B. The best continued course of action going forward.

The Lexington Police Department encourages employees, officers, and family members involved in incidents of deadly-force on in-custody deaths, to take advantage of available counseling services and peer support groups. In any case where such an incident occurs (whether or not death of an individual occurs), the Lexington Police Department will:

    a. Administratively investigate the incident as soon as practical;
    b. Request and assist the Mississippi Bureau of Investigation in the criminal investigation;
    c. Brief other agency members concerning the incident to minimize rumors. Agency members are encouraged to show the involved officers their concern;
    d. Respond to the media inquiries and release appropriate information regarding the incident to local media representatives;
    e. Request that involved officer(s) consider having phone calls answered by someone else for several days, if their names are released to the public.
    f. Supervisors will monitor the behavior of unit members for symptoms of post-traumatic stress disorder or changes in behavior that suggests the members are having difficulty with stress regarding the incident. Supervisors will report, to their chain of command, any behavior changes that might indicate a need for the affected officer to seek assistance or counseling from a mental health professional upon a reasonable belief that stress may be disrupting their job performance.

**G.** Reporting Use of Force

 Any use of force, above and beyond simple officer presence and dialogue, shall be documented in the officer's investigative reports as evidence to the behavior and justification of the use of such force. Specific instances in which reports must be completed at the earliest reasonable time include, but are not limited to:

    a. Anytime a firearm is discharged, except during training exercises;
    b. Anytime actions by an officer result in, or allegedly result in, any injury or death of another person;
    c. Any force through the use of lethal or less lethal weapons to include firearms, chemical agents, electronic weapons, or any other reasonable object used in an emergency situation;
    d. Any force through the use of weaponless physical tactics to include pressure points and subject control techniques, combative handcuffing techniques, and tactical escort techniques used on non-compliant subjects.

Any use of force required to be documented shall be immediately reported via the police radio to the dispatcher and the on-duty supervisor once the situation is under control and compliance gained by all subjects. Supervisor notification may be done via the police radio, telephone, or

verbally if a supervisor is on scene. Supervisors shall review and approve Use of Force Reports once complete.

> **Use-of-Force Reports**
> All incidents that include force greater than <u>Unresisted Handcuffing</u>, including the aiming of a firearm or ECW, shall have a Use-of-Force Report completed. The Use-of-Force report is a supplemental report attached to the Incident Report. Use-of-Force reports are only for those incidents where the force is directed at a human being.

> **Specific Reporting Requirements for Tasers**
> When a taser is deployed, the officer shall in addition to the above state requirements collect the used cartridge as evidence and enter the cartridge information in the property section of the Incident Report notating specifically the serial number of the cartridge for tracking.

**H.** Application of Force – Animal Control
Lexington Police Officers are authorized to use firearms to prevent roaming at large by obviously mad or vicious animals and/or to relieve the animals so badly injured that it cannot reasonably survive from injuries causing prolonged suffering. Officers shall notify their direct supervisor when reasonably able prior to use of a firearm with regards to animals. Officers called to discharge a firearm against an animal shall complete an Incident Report.

**I.** Administrative Review of Uses of Force
All Use of Force Reports shall be submitted to the reporting officer's Supervisor through their respective chain of command. The supervisor shall review the report for accuracy, content, thoroughness, and compliance to applicable policy and law. Once reviewed and approved by the Supervisor, the report will be forwarded to the Chief of Police.

Cases involving Uses of Deadly Force will be independently investigated by the Mississippi Bureau of Investigation for review of applicable state law.

The Chief of Police will review the reports for compliance to applicable policy and law and also identify areas of concern with regards to possible failures in policy or specific patterns of behavior of employees. If issues and concerns arise, the Chief of Police shall issue needed adjustments and changes.

Annually, all Use of Force reports for the prior year will be collectively reviewed and audited by Command Staff in an effort to identify patterns or trends of behavior and force that could indicate a need for additional training needs, equipment upgrades, and/or policy modifications.

## USE OF NON-LETHAL FORCE

The purpose of this policy is to provide police officers with guidelines on the use of non-lethal force. It shall be the policy of this department that an officer uses only that physical force reasonably necessary to control a situation or to affect an arrest.

- When in the exercise of the police authority, an officer strikes or inflicts injury upon a person or prisoner, the officer shall, besides completing appropriate police reports:
    - o Provide needed medical treatment to those injured.
    - o Immediately or as soon as possible, report the use of force or injury to a supervisor for appropriate review.

1. Impact Weapon:
   The policies for carrying and use of impact weapons are as follows:
    a. No officer shall carry an impact weapon in which he/she has not had annual certified training.
    b. The impact weapon should be carried in the baton ring or in a low profile position when the baton is not being used.
    c. At no time shall an officer unnecessarily brandish or use the impact weapon as an intimidation device unless the officer is attempting to prevent the further escalation of force.
    d. Any time an officer finds it necessary to strike a subject with an impact weapon for purposes of control, the officer will contact a supervisor as soon as possible to inform the supervisor of the incident.
    e. The supervisor (or an officer in the event a supervisor is not available) shall have an injured subject transported to the nearest medical facility for medical attention.

2. Chemical Agents (CS, CN, Teargas, OC, or other agents):
   The policies for carrying and the use of department approved chemical agents are as follows:
    a. No officer shall carry any chemical agent for which he/she has not had annual certified training.
    b. The chemical agent should be carried in an appropriate pouch and never displayed or pointed at another individual in the form of horseplay.
    c. At no time shall an officer unnecessarily brandish, or use the chemical agent as an intimidating device unless the officer is attempting to prevent further escalation of force.
    d. Application of chemical agents against large groups of people will be at the command of the Chief of Police or the designated commander.

    e.  Any time chemical agents are used for controlling an offender, the application of the chemical agent will end when the offender discontinues resistance or aggression.

    f.  When an officer books a subject who has been exposed to chemical agent, the officer will advise the jail personnel to prevent the unnecessary contamination of other jail occupants or custody personnel.

    g.  Any time an officer finds it necessary to use chemical agent for subject control, the officer will contact supervisor as soon as possible to inform the supervisor of the incident.

    h.  In the event OC is used to control a combatant subject, the supervisor (or officer) will transport subject to nearest medical facility if symptoms have not dissipated in reasonable amount of time. All subjects will be offered water within a reasonable amount of time if exposed to OC.

3.  Handcuffs and Restraints:

The departmental policies for the use of restraints are as follows:

    a.  All subjects taken into custody should be handcuffed behind their back and the handcuffs double-locked. This is to ensure the safety of the officer or other citizens. The exceptions to this rule are: when the subject has an injury that does not permit his/her arms to move behind the back; when the subject's age, physical condition, or physical limitations may also indicate a change in this procedure or when the arrest environment is tactically unsafe for the officer.

    b.  If an officer observes or the subject complains that the handcuffs are too tight, the officer is to ensure that unnecessary tightness does not occur.

    c.  To ensure proper safety for officers, all subjects will be handcuffed before being searched.

    d.  Except under exceptional circumstances, officers should not handcuff a subject to fixed objects such as posts, vehicles, buildings, etc.

    e.  It is not uncommon for an officer to arrest a subject, place him in restraints, and then have the subject start to resist. If an officer does encounter this type of resistance, the officer should utilize control techniques to prevent injuries to the officer or injuries to the subject. However, the control techniques should be limited to those which would not be construed as excessive force.

# THE USE OF BODY CAMERA

The purpose of this policy is to provide police officers with the guidelines on the use of a body camera. It shall be the policy of this department that each officer should wear a body camera on duty at all times.

Officer Safety takes precedence over recording events. Officer safety shall be the primary consideration when contacting citizens or conducting traffic stops, not the ability to record an event.

- Officers are advised to tell citizens they are recording when asked. Private Citizens do not have reasonable exception of privacy when talking with police officers during the scope of an officer's official duties, even when the contact is in a private residence. An exception to this guideline is during citizen complaint investigations. Officers and supervisors must inform complainants and witnesses they are being recorded.
- Unless unable, Officers shall record enforcement related contact which include: traffic stops, pedestrian stops, detentions and radio calls.
- Body worn cameras shall only be used for work related activity. Officers shall not record in areas where there is an exception of privacy including: locker rooms, restrooms, briefing rooms, and break rooms. Additionally, officers should avoid recording exposed areas of a citizen's body.
- Officers will avoid, when possible, recording people who are unrelated to the police purpose. Additionally, Officers will take into account HIPPA considerations when dealing with medical and psychiatric patients. Officers should normally turn their camera off when at a medical facility and when a clinician is interviewing a subject.
- Victim and witness interviews will generally not be recorded. Body worn cameras will not be used during Sex Crime and Child Abuse Investigations.
- Exception: Domestic Violence victims often recant their statements as early as the following morning after a crime. Victims may also make their children unavailable for investigations or court to avoid their providing statements. For these reasons, domestic violence victims with serious injuries, such as strangulation injuries are exceptions and their statements should be recorded if the victim is willing. Officers should also record the statements of children of domestic violence victims who are witnesses in these types of cases if the children are willing.
- Metadata should be entered at the conclusion of any event or as soon as possible thereafter.
- It is not the intent of the Department to review digital evidence for the purpose of general performance review or policy violations. Administrative review is limited to the

following: Officer Injury or death, Use of force by a member of the department, In-custody deaths, Police pursuits, Intentional and Unintentional discharges of a firearm, Officer involved traffic collisions, Preparation for trial proceedings, Internal Affairs investigations relating to a citizen complaint.

- Discovery of police misconduct during a review shall be reported to a supervisor by any Department member who views an event in question.
- Copying and releasing digital evidence to the public shall be treated like any other official record and handled accordingly pursuant to existing Department policies and procedures. All requests for video will be approved by the Chief of Police or his designee.

STATUS: Need to Know

Effective Date:
Review Date:

## I.   PURPOSE

The purpose of this policy is to maintain a healthy working environment and to provide procedures for reporting, investigation and resolution of complaints of harassment, sexual or otherwise.

## II.   POLICY

It is the policy of this department that all employees have the right to work in an environment free of all forms of harassment. The department does not condone, and will not tolerate, any harassment. Therefore, the department shall take direct and immediate action to prevent such behavior, and to remedy all reported instances of harassment, sexual or otherwise.

## III.   PROCEDURES

A.   Prohibited Activity

1.   No employee shall either explicitly or implicitly ridicule, mock, deride or belittle any person.

2.   Employees shall not make offensive or derogatory comments based on race, color, sex, religion or national origin either directly or indirectly to another person. Such harassment is a prohibited form of discrimination under federal law and is considered misconduct subject to approperiate disciplinary action by this department.

3.   Sexual harassment is defined as unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when:

a.   Submission to such conduct is made either explicitly or implicitly a term or condition of employment; or

b.   Submission to or rejection of such conduct by an employee is used as the basis for employment decisions affecting the employee; or

1

# Policy

# Harassment in the Workplace

31

Cannot read

c. Such conduct has the purpose or effect of unreasonably interfering with an employee's work performance or creating an intimidating, hostile, or offensive working environment.

B. Employee's Responsibilities

1. Each supervisor shall be responsible for preventing acts of harassment. This responsibility includes:

   a. Monitoring the unit work environment on a daily basis for signs that harassment may be occurring.

   b. Counseling all employees on the types of behavior prohibited, and the department procedures for reporting and resolving complaints of harassment;

   c. Stopping any observed acts that may be considered harassment, and taking appropriate steps to intervene, whether or not the involved employees are within his line of supervision; and

   d. Taking immediate action to limit the work contact between two employees where there has been a complaint of harassment, pending investigation.

2. Each supervisor has the responsibility to assist any employee of this department, who comes to that supervisor with a complaint of harassment, in documenting and filing a complaint with the internal investigations authority.

3. Each employee of this department is responsible for assisting in the prevention of harassment through the following acts:

   a. Refraining from participation in, or encouragement of, actions that could be perceived as harassment.

   b. Reporting acts of harassment to a supervisor; and

   c. Encouraging any employee, who confides that he is being harassed, to report these acts to a supervisor.

2

1.  Employees encountering harassment shall tell the person that their actions are unwelcome and offensive. The employee shall document all incidents of harassment in order to provide the fullest basis for investigation.

2.  Any employee who believes that he is being harassed shall report the incident(s) to his supervisor as soon as possible so that steps may be taken to protect the employee from further harassment, and appropriate investigative and disciplinary measures may be initiated. Where this is not practical, the employee may instead file a complaint with another supervisor, with the internal investigations authority, or the chief of police.

    a.  The supervisor or other person to whom a complaint is given shall meet with the employee and document the incidents complained of, the person(s) performing or participating in the harassment, and the dates on which it occurred.

    b.  The employee taking the complaint shall expeditiously deliver the complaint to the appropriate investigative authority.

3.  The internal investigation authority shall be responsible for the investigation of any complaint alleging harassment.

    a.  The internal investigations authority shall immediately notify the chief of police and the prosecutor's office if the complaint contains evidence of criminal activity, such as battery, rape or attempted rape.

    b.  The investigator shall include a determination whether other employees are being harassed by the person, and whether other agency members participated in, or encouraged the harassment.

    c.  The internal investigations authority shall inform the parties involved of the outcome of the investigation.

    d.  A file of harassment complaints shall be maintained in a secure location. The chief of police shall be provided with an annual summary of these complaints.

4.  There shall be no retaliation against any employee for filing a harassment complaint, or assisting, testifying, or participating in the investigation of such a complaint.

# Policy

Safety Belt Usage

39

<u>Off-duty responsibilities:</u>

1. While off-duty, it is the responsibility of the police officer to immediately report any suspected or observed criminal activities to on-duty authorities.

2. Except as allowed by this policy, off-duty officers should not enforce summary offenses or minor violations such as. harassment, disorderly conduct or other quality-of-life offenses.  On-duty personnel shall be contacted to respond to the situation where an off-duty officer becomes aware of such violations.

3. Where an arrest is necessary, the off-duty arresting officer shall abide by all departmental policies and procedures.

D. <u>Prohibited off-duty arrests:</u>  Police officers of this police department may not make an arrest off-duty:

1. When the arresting officer is personally involved in the incident underlying the arrest; or

2. When engaged in off-duty employment of a non-police nature, and the officer's actions are only in furtherance of the interests of the private employer.

3 When the arrest is made solely as enforcement of a minor traffic regulation.  Despite the fact that a police officer has police powers and responsibilities 24 hours a day throughout the jurisdiction, the off-duty officer should not enforce minor traffic regulations.

4. When the arresting officer is, or has been, consuming intoxicating beverages.

2

# OFF DUTY CONDUCT: POWERS OF ARREST

STATUS: Need to Know                          Effective Date:
                                              Review Date:

## I. PURPOSE

The purpose of this policy is to provide guidelines to police officers regarding acceptable criteria for effecting an off-duty arrest.

## II. POLICY

In order to promote safety and the most efficient operations, it is the policy of this agency to determine and regulate those situations and locations within which a sworn member is permitted to make an arrest while off-duty.

## III. PROCEDURES

Off duty officers are often faced with situations involving criminal conduct that they are neither equipped nor prepared to handle in the same manner as if they were on duty. This may lead to unnecessary injuries to off-duty officers, and confusion for those on-duty officers arriving at the scene trying to correctly assess the facts.

A.  Permitted off-duty arrests: When off-duty and within the legal jurisdiction of this police department, a police officer may make an arrest only when:

   1.  The arresting officer is not personally involved in the incident underlying the arrest, (Personally involved: Where the off-duty officer, a family member, or a friend becomes engaged in a dispute or incident with a person to be arrested or any other person connected with the incident. This does not apply to situations where the police officer himself is a victim of crime); and

   2.  There is an immediate need for the prevention of a crime or apprehension of a suspect; and

   3.  The crime would be charged as a jailable offense requiring a full custodial arrest; and

   4.  The arresting officer is in possession of appropriate police identification.

1

## LAW ENFORCEMENT CODE OF ETHICS

As a law enforcement officer, my fundamental duty is to serve mankind; to safe-guard lives and property; against oppression or intimidation; the peaceful against violence or disorder, and to respect the constitutional rights of all men to liberty, equality, and justice.

I will keep my private life unsullied as an example to all; maintain courageous calm in the face of danger, scorn or ridicule; develop self-restraint; and be constantly mindful of the welfare of others. Honest in thought and deed in both my personal and official life, I will be exemplary in obeying the laws of the land and regulations of my department. Whatever I see or hear of a confidential nature or that is confided to me in my official capacity will be kept ever secret unless revelation is necessary in the performance of duty.

I will never act officiously or permit personal feelings, prejudices, animosities, or friendships to influence my decisions. With no compromise for crime and with relentless prosecution of criminals, I will enforce the law courteously and appropriately without fear or favor, malice or ill will, never employing unnecessary force or violence and never accepting gratuities.

I recognize the badge of my office as a symbol of public faith, and I accept it as public trust to be held as long as I am true to the ethics of police service. I will constantly strive to achieve these objectives and ideals, dedicating myself before God to my chosen profession, law enforcement.

_____

Officer's Name

Note: This code has been officially adopted by the International Association of Chiefs of Police and many law enforcement agencies.

# EMPLOYEE POLICY MANUAL

## TABLE OF CONTENTS

- Introduction...............................................................................1
- Law Enforcement Code of Ethics..................................................2
- Rules of Conduct.......................................................................3
- Patrolmen Rules of Conduct........................................................7
- Command and Supervisory Personnel...........................................11
- Police Procedures – Vehicle Pursuit.............................................12
- Police Department – Use of Force...............................................18
- Use of Non-Lethal Force...........................................................27
- Use of Body Camera.................................................................29
- Harassment in the Workplace.....................................................
- Off-Duty Conduct: Power of Arrest.............................................
- Safety Belt Usage....................................................................

# LAW ENFORCEMENT CODE OF ETHICS

As a law enforcement officer, my fundamental duty is to serve mankind; to safe-guard lives and property; against oppression or intimidation; the peaceful against violence or disorder, and to respect the constitutional rights of all men to liberty, equality, and justice.

I will keep my private life unsullied as an example to all; maintain courageous calm in the face of danger, scorn or ridicule; develop self-restraint; and be constantly mindful of the welfare of others. Honest in thought and deed in both my personal and official life, I will be exemplary in obeying the laws of the land and regulations of my department. Whatever I see or hear of a confidential nature or that is confided to me in my official capacity will be kept ever secret unless revelation is necessary in the performance of duty.

I will never act officiously or permit personal feelings, prejudices, animosities, or friendships to influence my decisions. With no compromise for crime and with relentless prosecution of criminals, I will enforce the law courteously and appropriately without fear or favor, malice or ill will, never employing unnecessary force or violence and never accepting gratuities.

I recognize the badge of my office as a symbol of public faith, and I accept it as public trust to be held as long as I am true to the ethics of police service. I will constantly strive to achieve these objectives and ideals, dedicating myself before God to my chosen profession, law enforcement.

_____

Officer's Name

Note: This code has been officially adopted by the International Association of Chiefs of Police and many law enforcement agencies.



# LEXINGTON POLICE DEPARTMENT

## *TASER USE REPORT*

Date/Time: 12-31-21    TASER Officer's Name: Dfc. Epps

E-mail: _____    Department: _____

Dept Address: 207 Tchula St.    Phone: 667-834-3508

Suspects Name: ███████████████

On Scene Supervisor: Chief Dobbins Officer(s) Involved: 3

TASER® Model (check one): ✓ TASER X26 ___ ADVANCED TASER M26

If an ADVANCED TASER M26 Was Used, What Battery Type: ___ Alkaline ___ NiMH Rechargeable

TASER Cartridge Type(s):    ___ 21-ft Standard    ___ 21-ft XP    ___ 25-ft Standard    ___ 25-ft XP
___ 35-ft XP    ✓ 15-ft

TASER Serial #: X00-703042, Medical Facility: N/A    Doctor: N/A

Nature of the Call or Incident: Noise Complaint Charges: Failure to Comply Booked: (Y)/ N

Type of Subject: ✓ Human    ___ Animal

Location of Incident: ( ) Indoor (✓) Outdoor ( ) Jail ( ) Hospital

Type of Force Used (Check all that apply):    (✓)Physical ( )Baton ( )Impact Munition
( )Chemical ( ) Firearm

Nature of the Injuries and Medical Treatment Required: None

Admitted to Hospital for Injuries: Y /(N)    Admitted to Hospital for Psychiatric: Y (N)

Medical Exam: Y (N)    Suspect Under the influence: (Alcohol)/ Drugs (specify): possible

Was an officer/law enforcement employee injured other than by TASER? Y /(N)

Incident Type (circle appropriate response(s) below):

(Civil Disturbance)    Suicidal    Suicide by Cop    Violent Suspect    Barricaded    Warrant    Other

Age: 43    Sex: M    Height: 6'3    Race: Blk    Weight: 202

Was a TASER CAM in use? Y (N)

TASER use (circle one): (Success)/ Failure    Suspect wearing heaving or loose clothes: Y /(N)

Number of cartridges fired: __1__          Number of cycles applied: __1__

Usage (check one): ( ) Arc Display Only   (✓) Laser Display Only   ( ) TASER Application

TASER:  Is this a dart probe contact: (Y)/ N          Is this a drive stun contact:  Y /(N)

Approximate target distance at the time of the dart launch: ___10___ feet

Distance between the two probes: __6__ inches          Need for an additional shot?  Y /(N)

Did dart contacts penetrate the subject's skin? (Y)/ N          Probes removed on scene: (Y)/ N

Did TASER application cause injury:  Y /(N)  If yes, was the subject treated for the injury: (Y)/ N

DESCRIPTION OF INJURY:
_____probes in skin. Removed by paramedic_____
_____
_____

**APPLICATION AREAS**
**(Place "X's" where probes hit suspect AND "O's" where stunned)**



SYNOPSIS:
On 12/31/2021 Officers were dispatched to Pecan Grove for fireworks after 10pm. Chief Dobbins arrived on 4th Street with ▇▇▇▇▇. The subject was instructed it was past time to stop shooting fireworks. He got upset and told me to stop fucking with him. Then his brother GB started screaming profanity at Chief Dobbins. ▇▇▇▇▇ got extremely aggressive towards Chief Dobbins. He charged toward Chief Dobbins in an aggressive manner. Ofc Rpp told him to stay back and he continued charged forward. Ofc Rpp tased the subject and took him into custody.

Need for additional applications?  Y /(N)  Did the device respond satisfactorily? (Y)/ N

If the TASER deployment was unsuccessful was a DRIVE STUN followup used?  Y /(N)

The subject was transported to booking. He was treated and released by medstat to remove the prongs. He was cleared medically. He the bonded out.

Describe the subject's demeanor after the device was used or displayed?

He was taken into Custody

Chemical Spray: Y (N)          Baton or Blunt Instrument: Y (N)

Authorized control holds: Y (N)     If yes, what types: Verbal

Describe other means attempted to control the subject: _____

Photographs Taken: Y (N)            Report Completed by:

_____            EPPS

---

*ADDITIONAL INFORMATION*

---

1. Save this file to your hard drive and for your department archives.
2. Submit this report to the national TASER technology incident database.
3. Results of uses are reviewed by TASER Int'l to adjust training issues and concerns as well.
4. Email this copy to Andrew@TASER.com. If you cannot email, please fax a copy of this report to: (480) 991-0791 Attn: Andrew Hinz (Ph: 800-978-2737 ext. 2048).

# Arrest Report

Lexington Police Department

| PD# | Officer | Bdg# | Case # | Date |
|---|---|---|---|---|
| 3 | Cordarius Epps | 3 | | 12/31/2021 |

**Last** ▮▮▮ **First** ▮▮▮ **Mi**

**Address** ▮▮▮ **City** ▮▮▮ **State** ▮ **Zip** ▮▮▮

**D.O.B.** ▮▮▮ **Height** 6'3 **Weight** 202 **Race** B **Sex** M

**Eye** BRO **Hair** BLK

**DL#** **SSN#** ▮▮▮ **Phone #s**

**Scars or Marks**

**Age at Arrest** **Alias**

**Occupation** none

**Employer** none

**Charges** Failure to comply

**Bond**

**Ticket or Aff. #**

# Arrest Report

Lexington Police Department

## ARREST REPORT

Case #  _____

## NARRATIVE
**(INCLUDE IF PHOTOS WERE TAKEN, FINGERPRINTS AND EVIDENCE IF ANY SECURED AT LOCATION AND ANY OTHER INFORMATION VITAL TO REPORT)**

On 12/31/2021 Officers were dispatched to Pecan Grove for fireworks after 10pm. Chief Dobbins arrived on 4th street to meet with ▮▮▮▮▮ The subject was instructed it was past time to stop shooting fireworks. He got upset and told me to stop fucking with him. Then his brother got started screaming profanity at Chief Dobbins. ▮▮▮▮▮ got extremely aggressive towards Chief Dobbins. He charged toward Chief Dobbins in an aggressive manor. Ofc Epps told him to stay back and he continued to charge forward. Ofc Epps tased the subject and took him into custody. The subject was transported to booking. He was treated and released by medstat to remove the prongs. He was cleared medically. He then bonded out.

**ADDITIONAL SHEET ATACHED**  YES ☐  NO ☐

**OFFICER'S SIGNATURE**

**SUPERVISOR APPOVAL DATE:**                **SUPERVISOR DISAPPROVAL DATE:**

BY:                                                          **PAGE # 2**

# City of Lexington



RECEIVED
AUG 11 2021
By BP 8·Ko

**BOARD MEETS EVERY 1ST TUESDAY OF EACH MONTH; REQUEST MUST BE IN BY
12 NOON FRIDAY BEFORE THE 1ST TUESDAY.**

### REQUEST OF AGENDA

*Executive Session*

**Person Requesting:** _LaShawn Kyzer_

**Representing:** _____

**Street/Mailing Address:** _204 College St_

**City, State, Zip:** _Lexington, MS 39095_

**Home Phone:** _____ **Best Time to Call:** _7:00 A.m. - 7:00 P.m._

**Cell Phone:** _662-739-0766_

**Agenda Requested (Please be as clear and concise as possible.):**

_A meeting with the board pertaining to the
complaint on the Chief of Lexington Police Dept with
the retaliation that has occured._

**Requestor's Signature:** _____   **Date:** _8/11/21_

**Please submit this request to:**

City of Lexington
112 Spring Street
Lexington, MS 39095
662-834-1261

Satisfactory. Status with consultation Exec. Session

Lexington Police Department

Public Complaint Form

RECEIVED
AUG 10 2021
By BP 4:17 PM

Date Complaint filed: 8-9-21 Public Official's name: ______

Complainant's name: LaShawn Kyzer

Address: 204 College St. Lexington, Ms 39095

Phone: Home: ______ Cell: 662-739-0766

By filing this report, I understand that, I, LaShawn Kyzer and Chief Sam Dobbins may be subject to an investigation by the Lexington Police Department. Further more, I swear that this statement is true and I may be charged for filing a false report on the public official listed above.

On August 7, 2021, Sat night app. 8:54 pm Chief Sam Dobbins was operating the white SUV. At this time the chief was coming up Blvd. St facing the square, I was facing Bank Plus to make a right turn when Chief Sam Dobbins ran the Stop Sign beside People's Drug Store, making a left turn to where He (Sam Dobbins) pulled into the police station I pulled into Police Station to see who was driving so reckless in the Police SUV. An officer (new hire) got out of the truck and walked to my vehicle and I asked him who was driving this vehicle so reckless that officer said the Chief by that time Chief Dobbins came to my truck and said he was in an emergency then He (Sam) asked my mother who was in the vehicle with me did she get a tag for the truck I bought the truck on Wed. Aug 4, 2021 - purchased tag on Aug 5-2021. The purchased of the tag was not the issue The issue was just because You have made Chief doesn't give you (Sam) the right to do what you want. This could have caused a major accident

Complainant's Signature: [signature] Chief of Police: ______

# City of Lexington

**BOARD MEETS EVERY 1ST TUESDAY OF EACH MONTH; REQUEST MUST BE IN BY 12 NOON FRIDAY BEFORE THE 1ST TUESDAY.**

### REQUEST OF AGENDA

**Person Requesting:** Anthony Brown

**Representing:** MMAd MENS MAking a Different

**Street/Mailing Address:** Olive St Lexing

**City, State, Zip:** Lexington MS 39095

**Home Phone:** 601-668-6690   **Best Time to Call:** Any

**Cell Phone:** 601-668-6690

Mill of 30 days

**Agenda Requested (Please be as clear and concise as possible.):**

CHange ORdiNance as It relate to abandon PRoPest

How many certified Officer do we Have in the City of Lexington.

**Requestor's Signature:** _(signature)_   **Date:** 8-27-2021

Please submit this request to:

City of Lexington
112 Spring Street
Lexington, MS 39095
662-834-1261

RECEIVED
AUG 27 2021
By _(initials)_
10:21 AM

RECEIVED
SEP 30 2021  10:54 am
By BP

RECEIVED
SEP 30 21
By

# City of Lexington

**BOARD MEETS EVERY 1ST TUESDAY OF EACH MONTH; REQUEST MUST BE IN BY 12 NOON FRIDAY BEFORE THE 1ST TUESDAY.**

### REQUEST OF AGENDA

**Person Requesting:** Anthony Brown

**Representing:** MMAD

**Street/Mailing Address:** PO Box 148

**City, State, Zip:** Lex, MS 39095

**Home Phone:** 601-668-6690   **Best Time to Call:** ANY

**Cell Phone:** 601-668-6690

**Agenda Requested (Please be as clear and concise as possible.):**

How many certified officer with all their Training done on the police force. What the status of chief Training procedure are in place for the police dept. Ordinance related to abandon vehicles. Why Is the chief still being paid and dont Have proper Training after one year that required by law. How many officer Have quit or been fired and the last 90 days.

**Requestor's Signature:** _[signature]_   **Date:** Oct-1 2021

**Please submit this request to:**

**City of Lexington**
**112 Spring Street**
**Lexington, MS 39095**
**662-834-1261**

Lexington Police Department

Public Complaint Form

Date Complaint filed: 1/33/21          Public Official's name: Officer Moore

Complainant's name: Yolanda Wallace

Address: 3360 Clifton St. Lexington Ms. 39095

Phone: Home: _____ Cell (601) 639-0726

By filing this report, I understand that, I, _____ and _____ may be subject to an investigation by the Lexington Police Department. Further more, I swear that this statement is true and I may be charged for filing a false report on the public official listed above.

On Sunday evening at approximately 6:31pm my nephew Rodney Wallace called my phone and said Aunt Tee that police had Squirt down here at Megs Checking his pockets and asking him what do he have in his pocket and do he have a ID on him. I ask why was they frisking him and he said he don't know, because Squirt didn't do anything wrong. He should have not his hand on him, why would he do that. So I told him to let me speak to Squirt and when he got on the phone I ask Squirt what's going on and Squirt told me that, when he came out the store the police officer called him over to Dee car and he ask him, what was his name and do he have an ID and he said nope and he ask him how old he was and he said 18 and the police officer ask Squirt to come walk over here with him and then he told him to put his hands on top of his car and he started searching him and he ask Squirt, what do you have in your pockets and Squirt said nothing but his phone condom and EBT card. And than he just said hold on right here and thats when he called they other officer and told him to stand behind him and than Sam came over and ask Squirt whats his name is and do he have an ID and how old is he and Squirt said no I don't have an ID and he said that he is 18 and Sam walked off and when he came back he told them to lets go. So I ask why, what was the reason he search him/do he say why or what and squirt said no he didn't say anything and I said thats wrong our black kids can't even go to store in peace without them police officer picking on them. Lord God Jesus knows everything that theyre doing to his children. He knows.

Complainant's Signature: Yolanda Wallace        Chief of Police: Sam Rollins



Lexington Police Department

Public Complaint Form

Date Complaint filed: 12-2-2021    Public Official's name: _____

Complainant's name: Shirley Stewart

Address: 143 Coals Rd Lexington

Phone: Home: _____ Cell: 662-299-2769

By filing this report, I understand that, I, Shirley Stewart and Ashley Stewart may be subject to an investigation by the Lexington Police Department. Further more, I swear that this statement is true and I may be charged for filing a false report on the public official listed above.

Harassment from City Police officers.
I would like to speak to the board about Sam
Dobbins and office Henderson. officers Dobbins
pull up on my grandson telling him what someone
else told him about the car he own. i have talk to
the mayor Robin Mcory about mr. Dobbin Before. he
also made a statement said if you see any Stewarts
speeding pull them over We taking this Straight to
madison county. I don't Know what he got going on
with Stewart We haven't done anything to him.
my daughter was having car problem in the City of
Lexington and was harassed by officer Henderson
he told her if she didnt move her car right now.
She was going to Jail.

Complainant's Signature: Shirley Stewart    Chief of Police: _____



3-28

# City of Lexington

**BOARD MEETS EVERY 1ST TUESDAY OF EACH MONTH; REQUEST MUST BE IN BY 12 NOON FRIDAY BEFORE THE 1ST TUESDAY.**

### REQUEST OF AGENDA

**Person Requesting:** Shirley Stewart

**Representing:** _____

**Street/Mailing Address:** 143 Coats Rd

**City, State, Zip:** Lexington, MS.

**Home Phone:** _____ **Best Time to Call:** _____

**Cell Phone:** 662 299.3769

**Agenda Requested (Please be as clear and concise as possible.):**

Harassment from police officers.
Sam Dobbins Officers Henderson

_____

_____

_____

_____

**Requestor's Signature:** Shirley Stewart **Date:** 12-2-2021

**Please submit this request to:**

> **City of Lexington**
> **112 Spring Street**
> **Lexington, MS 39095**
> **662-834-1261**

# City of Lexington



RECEIVED
DEC 0 6 2021
10:20am
By

**BOARD MEETS EVERY 1ST TUESDAY OF EACH MONTH; REQUEST MUST BE IN BY
12 NOON FRIDAY BEFORE THE 1ST TUESDAY.**

### REQUEST OF AGENDA

**Person Requesting:** Pluma Gibson

**Representing:** Shirley Gibson

**Street/Mailing Address:** 111 Cemetery St

**City, State, Zip:** Lexington, Mississippi 39095

**Home Phone:** _____  **Best Time to Call:** Anytime

**Cell Phone:** 662-730-1800

**Agenda Requested (Please be as clear and concise as possible.):**

I am requesting to address the broad regarding
an incident that taken place on Dec 2, 2021, in
the City of Lexington. Involving Lexington P.D.

**Requestor's Signature:** Pluma Gibson  **Date:** 12-6-2021

**Please submit this request to:**

> **City of Lexington**
> **112 Spring Street**
> **Lexington, MS 39095**
> **662-834-1261**

Called 3:54pm on city hall land line. Peter in reference to her agenda to request that litigation pending for the board of alderman

1/5/22

# City of Lexington

**BOARD MEETS EVERY 1ST TUESDAY OF EACH MONTH; REQUEST MUST BE IN BY 12 NOON FRIDAY BEFORE THE 1ST TUESDAY.**

### REQUEST OF AGENDA

**Person Requesting:** _Cardell Wright_

**Representing:** _____

**Street/Mailing Address:** _72 Bain Circle_

**City, State, Zip:** _Durant, MS 39063_

**Home Phone:** _____   **Best Time to Call:** _Any_

**Cell Phone:** _601-421-1900_

**Agenda Requested (Please be as clear and concise as possible.):**

_Police Misconduct and Public Participation_

**Requestor's Signature:** _Mr Wright/LSR_   **Date:** _12/22/21_

Please submit this request to:

> City of Lexington
> 112 Spring Street
> Lexington, MS 39095
> 662-834-1261

DEC 2 2 2021

By



RECEIVED
JAN 0 4 2022
By _BP_ 11:34am

# City of Lexington

*BOARD MEETS EVERY 1ST TUESDAY OF EACH MONTH; REQUEST MUST BE IN BY*
*12 NOON FRIDAY BEFORE THE 1ST TUESDAY.*

### REQUEST OF AGENDA

**Person Requesting:** Brenda Johnson

**Representing:** Dorothy Gaston

**Street/Mailing Address:** 15898 Galilee Rd

**City, State, Zip:** Lexington MS. 39098

**Home Phone:** 662-508-810 **Best Time to Call:** Anytime

**Cell Phone:** Same

**Agenda Requested (Please be as clear and concise as possible.):** Please put me on the agenda for 11-4-22. I Would like to speck about harassment.

**Requestor's Signature:** Brenda Johnson **Date:** 1-4-22

Please submit this request to:

City of Lexington
112 Spring Street
Lexington, MS 39095
662-834-1261



# City of Lexington

RECEIVED
JAN 2 5 2022
By

*BOARD MEETS EVERY 1ST TUESDAY OF EACH MONTH; REQUEST MUST BE IN BY 12 NOON FRIDAY BEFORE THE 1ST TUESDAY.*

### REQUEST OF AGENDA

**Person Requesting:** *Linda Selles / Mr. Wright*

**Representing:** _____

**Street/Mailing Address:** 203 North St

**City, State, Zip:** Lexington Ms. 39095

**Home Phone:** _____ **Best Time to Call:** any

**Cell Phone:** 662-306-0304

**Agenda Requested (Please be as clear and concise as possible.):**

Work Day and Inhumane treatment

_____

_____

_____

_____

**Requestor's Signature:** *Linda Selles / Mr. Wright* **Date:** 1/25/22

**Please submit this request to:**

City of Lexington
112 Spring Street
Lexington, MS 39095
662-834-1261